COMMONWEALTH vs. CLAYTON M. BRYANT.

Essex.   April 4, 1983. — January 10, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Waiver of
   constitutional rights, Assistance of counsel. *Waiver. Evidence,* Ad-
   missions and confessions, Other offense. *Practice, Criminal,* Volun-
   tariness of confession, Disclosure of evidence, Assistance of counsel.

At the hearing on a motion to suppress confessions made to a police officer
   by a defendant in a murder case, evidence that statements had been
   made during an informal, unaggressive interview by the officer in the
   defendant's home and with the defendant's voluntary acquiescence as
   part of an ongoing investigation which was not exclusively focused on
   the defendant warranted the judge's conclusion that the defendant's
   statements were obtained in a noncustodial environment [735-738]; a
   different conclusion was not required with respect to interrogation
   which took place after a fifteen-second silence following the defend-
   ant's statement that "I did it, I shot him," absent evidence that follow-
   ing the brief gap in the conversation, the defendant was in fact
   restrained or reasonably perceived himself to be restrained [738-742].
At a murder trial, the judge did not abuse his discretion in admitting evi-
   dence that the defendant made two prior attempts on the victim's life,
   where the evidence was related to attempts which took place within
   two months of the crime charged, was indicative of hostility and ac-
   tual malice toward the victim, and was relevant on the issue of pre-
   meditation. [744-745]
The judge in a criminal case who, at a hearing on a suppression motion,
   had ruled that the defendant's confession was voluntary, was not
   obliged to hold a further voir dire at trial before admitting the confes-
   son in evidence. [745]
At a criminal trial, the judge did not err in denying the defendant's mo-
   tions for a dismissal of the indictment, a mistrial, or a new trial based
   on the prosecutor's delayed disclosure of the time of the victim's death,
   since the defendant did not demonstrate any prejudice to his defense
   arising from the belated disclosure. [745-749]
A claim of ineffectiveness of defense counsel in a criminal case was not
   supported by the contention that counsel had failed to emphasize the
   proposition that the defendant's confessions were involuntary because

they were induced by promises of leniency, where counsel had presented the issue and the judge had submitted it to the jury. [750]

A defendant was not denied the effective assistance of counsel by reason of his attorney's not calling certain witnesses, where it was not clear that their testimony would have helped his cause. [750-752]

A claim of ineffectiveness of counsel for the defendant in a criminal case was not supported by counsel's failure to request instructions requiring the jury to find that the defendant's confessions were obtained in compliance with Miranda standards where such compliance was a question of law for the judge. [753]

At a murder trial, defense counsel's tactics in closing argument, in focusing on the defendant's motive for making a confession, which he later repudiated, did not support a claim of ineffective assistance of counsel. [753-754]

INDICTMENT found and returned in the Superior Court Department on February 12, 1979.

The case was tried before *Linscott*, J., and a motion for a new trial was heard by him.

*William C. Madden* for the defendant.

*Lila Heideman*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Clayton M. Bryant appeals from his conviction of murder in the first degree. Bryant's principal claim is that he was subjected to a custodial interrogation by the Newbury chief of police in the absence of adequate Miranda warnings. See *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). Bryant also claims that the judge erred in the admission of evidence of his two prior attempts on the victim's life; the failure to conduct a voir dire on voluntariness; the denial of motions for dismissal, mistrial, or a new trial, due to prosecutorial misconduct; and the denial of a motion for a new trial based on a claim of ineffective assistance of counsel. The defendant also asks us to grant him relief pursuant to G. L. c. 278, § 33E. We conclude that there is no reversible error, and that there is no reason for us to exercise our power under G. L. c. 278, § 33E, to order a new trial or direct the entry of a verdict of a lesser degree of guilt.

We briefly describe the facts, reserving the details for discussion in the context of the specific claims raised by the de-

fendant's appeal. The defendant, a thirty-seven year old employee of the Federal government's Young Adult Conservation Corps for New England, lived on Plum Island in a trailer. Near to the defendant's trailer was P.J.'s Restaurant and store (P.J.'s), owned and run by Jane McNeal. The defendant was a regular customer of P.J.'s. Bryant was in love with McNeal, was fond of her children, and wanted to marry her. McNeal, however, would not date Bryant. McNeal had been dating the victim William Seduski for approximately one year. Seduski, an architect, lived close to the defendant's trailer and near to P.J.'s.

On November 21, 1978, Seduski was shot in the chest with a sixteen gauge shotgun at his home. Since the defendant was known to have disliked the victim, he was one of several police suspects in the investigation following the homicide. The defendant's hostility toward Seduski was based in part on jealousy of Seduski for his steady relationship with Jane McNeal.

The defendant confessed to the police on February 2 and 3, 1979. After his confessions were admitted in evidence, the defendant testified that he had confessed falsely to protect McNeal, because he believed the police's suspicions to have focused on her. There was evidence at trial from which the jury could have concluded that the shooting occurred between 6:30 and 7 P.M., a time for which the defendant had no alibi. There was also evidence placing the defendant near the victim's house immediately prior to that half-hour period. However, without the defendant's statements, there was insufficient evidence to convict.

1. *The confessions.* The defendant moved before trial to suppress his confessions. We summarize the facts as found by the judge on the motion to suppress, amplified by those facts which are undisputed.[1] On the day after the murder,

---

[1] We refer at times to additional facts developed at the suppression hearing, see *Commonwealth v. Mahnke,* 368 Mass. 662, 666 n.3 (1975), cert. denied, 425 U.S. 959 (1976), bearing in mind the judge's finding that he was "impressed with the sincerity [and] honesty" of the police chief, the principal witness. The defendant did not testify at the suppression

the State police lieutenant in charge of the homicide investigation interviewed the defendant at the police station. Prior to questioning, the defendant was given the Miranda warnings.   See *Miranda* v. *Arizona, supra.*   The defendant voluntarily spoke to the officer but denied that he was involved in the murder.   The statements made at that interview were not suppressed and are not at issue on appeal.

During the next month, the lieutenant and the defendant met briefly on the street twice, and once at P.J.'s.  On one of these occasions, the lieutenant asked the defendant if they could meet again to discuss the shooting, and the defendant stated, "Anytime you want."   In January, 1979, the new chief of the Newbury police department, recently appointed, was introduced to the defendant.[2]   On February 2, 1979, the police chief arrived at the defendant's home at 5 P.M., pursuant to an appointment to speak with the defendant.[3]   The chief was wearing a uniform and carrying a gun, as he had just come off duty.

The defendant invited the chief in, and offered him a cup of coffee.   After chatting for a few minutes, the chief told the defendant he was investigating the crime, and that he wanted to discuss the crime with the defendant.   The defendant agreed to do so.   The chief told the defendant that he did not have to talk, and that anything he said could be used against him in court.   The chief asked the defendant if he could afford an attorney, and they discussed his finances briefly.[4]   The defendant was not told that if he could not af-

hearing.  The facts we recite were undisputed at that hearing.  The most salient fact not found by the judge that we must consider is the chief's statement that after the defendant said he shot Seduski, the chief asked the defendant whether he wanted to "tell me about it."

[2] The new chief assumed his position on or about January 1, 1979.  He did not come from Newbury and was unfamiliar with the crime.  He was, however, briefed by the State police as to this investigation.

[3] The appointment was arranged by the Newbury police chief and the State police lieutenant the previous week.  The police lieutenant was unable to attend.

[4] The defendant told the police chief that he had a total of $2,900 in two banks, and that he owned his trailer home, although he had a mortgage

ford an attorney, one would be appointed to represent him during the interrogation. *Miranda* v. *Arizona, supra* at 473. The defendant then described his actions on the evening of November 21, 1978, and denied he was involved in the crime.

For approximately two and a half hours, the police chief and the defendant discussed general subjects, including the defendant's sex life, Maine, and snowmobiling. At 7 P.M., the chief offered to leave, but the defendant said he had no plans for the evening. He offered the chief a second cup of coffee. The conversations turned to a discussion of Jane McNeal, her relationship with the victim, and her children. At about 7:50 P.M., the chief responded to the defendant's professed dislike of Jane McNeal's relationship with the victim by saying that the defendant's relationship with Jane McNeal had deteriorated since the homicide. The chief told the defendant that Jane McNeal now became very nervous whenever the defendant walked into P.J.'s, and that her children now were afraid of the defendant. At the hearing, the chief testified that the defendant responded that he "didn't know [I] hurt the kids . . . [I] just didn't want Seduski to hurt them. . . . I did it, I shot him." This initial statement was followed by a brief time gap, during which both the police chief and the defendant were silent. The police chief's testimony, which the judge found credible, was that he was stunned by the admission, since he had believed the defendant to be innocent. Ten or fifteen seconds after the defendant's statement that he shot the victim, the chief told the defendant that he (the defendant) "must be glad to get that off his chest," and asked the defendant "if he would like to tell me about it." [5] The defendant then made a detailed confession.[6]

---

on it. The defendant had court appointed counsel for the trial and on appeal.

[5] The chief's testimony was that "I asked him if he would like to tell me about it. I believe I did state that he must be glad to get that off his chest, something to that effect. And I asked him if he did want to say anything about it."

[6] The judge treated the defendant's first statement and his later detailed description of the crime as if there were no interruption. As we read the

At the suppression hearing, the chief said that the defendant stated "that he had come home from work that day, and he knew then that this was the day he was going to kill Seduski." Bryant said that between 6:30 and 6:45 P.M., he put the gun under his clothes, walked down the street, knocked on Seduski's door, pulled the trigger when Seduski answered, broke the gun into pieces, threw the pieces into the ocean, returned to his home, changed his wet clothes, went out for supper at 7 P.M., returned home at about 7:20 P.M., called his sister in Maine, and then went out for drinks. The police chief "never said a word" during the latter confession, but simply let the defendant tell his story. The defendant did not ask him to leave at any point during the confession.

After the defendant's detailed confession, the chief arrested him. The defendant collected some clothes, fed his dog and asked if the chief wanted his snowmobile for the winter. The chief handcuffed the defendant.

At the police station, the defendant was given complete Miranda warnings and asked if he would make a written confession. The defendant wrote out a confession that confirmed the oral confession described by the chief. He specified that the time of the shooting was approximately 6:30 P.M. The defendant admitted that he used his sixteen gauge shotgun to shoot Seduski. The confession was witnessed by the police chief and a police sergeant.

Soon after the defendant was placed in a cell, a police sergeant went to see him. Prefacing his questions with the remark, "Having your rights in mind," the sergeant asked

---

record, the defendant did not offer the details of the crime until further questioning and therefore his statement was not a continuous discourse. The chief said that, when the defendant stated that he had shot Seduski, "I was leaning forward in the chair at that time in his kitchen, I sat back for ten or fifteen seconds, at most, and I asked him if he would like to tell me about it." The judge found the chief credible and we, therefore, accept the chief's statement that he questioned Bryant between the two statements.

the defendant about prior attempts on the victim's life.[7] One of these was the burning of the victim's house on the evening of September 23, 1978; the other involved the discovery of a shotgun left pointing at the victim's house from the dunes across from it in October, 1978. The defendant confessed both to setting the fire and leaving the shotgun on the sand.

The following morning, the State police lieutenant interviewed the defendant after giving him Miranda warnings once more. The defendant restated his confessions to the shooting, the fire, and the earlier attempt from the dunes.

The judge decided that the warnings given to the defendant at the beginning of his conversation with the police chief were sufficient to meet the requirements of *Miranda* v. *Arizona*, 384 U.S. 436 (1966). In addition, the judge determined that the police chief's discussion with the defendant

---

[7] The sergeant did not, however, restate the Miranda warnings. At the suppression hearing, the defendant argued that his February 2, 1979, confession to prior attempts on the victim's life, given to the sergeant at the police station after the defendant's arrest, should be suppressed because the sergeant did not fully restate the Miranda warnings before interrogating the defendant with regard to the prior attempts. The defendant does not pursue this argument on appeal, and it is deemed waived. *Commonwealth* v. *Cundriff*, 382 Mass. 137, 150 n.22 (1980), cert. denied, 451 U.S. 973 (1981). Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). Pursuant to our duties under G. L. c. 278, § 33E, we consider whether the sergeant's failure to give fresh warnings raises a substantial likelihood of a miscarriage of justice.

The judge found that the statements were made to the sergeant after the defendant had received complete Miranda warnings, and that, although the sergeant did not reiterate the warnings, he did remind the defendant of the warnings. The record indicates that the sergeant's interrogation of the defendant took place five minutes after the defendant had received Miranda warnings and had signed a written confession to the shooting. In view of the short interval between the two interrogations, we are satisfied that the defendant had full knowledge of his legal rights when he confessed to the sergeant. We conclude that the failure to give new Miranda warnings also does not create a substantial likelihood of a miscarriage of justice. See *Biddy* v. *Diamond*, 516 F.2d 118, 122 (5th Cir. 1975), cert. denied, 425 U.S. 950 (1976), and cases cited. See also *United States* v. *Fike*, 563 F.2d 809, 814 (7th Cir. 1977), cert. denied, 434 U.S. 1072 (1978); *United States* v. *Delay*, 500 F.2d 1360, 1365 (8th Cir. 1974).

at his home was not "custodial interrogation," and that therefore no Miranda warnings were required at that time.

The defendant asserts that his confession to the chief of police during their February 2, 1979, conversation at the defendant's home was obtained in violation of *Miranda* v. *Arizona, supra,* and that the defendant's subsequent confessions at the police station on February 2 and 3, 1979, after he was arrested, are the tainted fruit of the initial illegally obtained confession.   Consequently, the defendant concludes that the judge erred in denying the motion to suppress.

Miranda warnings are only necessary for "custodial interrogations."   *Oregon* v. *Mathiason,* 429 U.S. 492, 494-495 (1977).   *Miranda* v. *Arizona, supra* at 444.   *Commonwealth* v. *Haas,* 373 Mass. 545, 551 (1977).   The police are not required to give warnings every time they interview a witness, but only when the witness is in "custody."   "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."   *Miranda* v. *Arizona, supra.*

Setting aside obvious cases in which a suspect has been formally arrested or otherwise deprived of his physical freedom by police agents, the problem whether interrogation has taken place in custodial circumstances is a vexing one, susceptible to resolution in most instances only by close scrutiny of the particular questioning session.   "There is no specific formulation on which we can rely as an aid in determining whether a person's freedom of action is sufficiently curtailed so as to require the so called Miranda warnings."   *Commonwealth* v. *Haas, supra* at 552.   The difficulties inherent in determining whether a given confrontation between suspect and police is appropriately characterized as custodial derive from the necessity of answering what is essentially a subjective inquiry — whether, from the point of view of the person being questioned, the interrogation took place in a coercive environment — by reference to objective indicia.   See *United States* v. *Hall,* 421 F.2d 540, 544

(2d Cir. 1969), cert. denied, 397 U.S. 990 (1970), aff'd on rehearing en banc, 459 F.2d 454 (2d Cir. 1972).

In previous cases, our inquiry has been informed by a variety of factors: (1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest. See *Commonwealth* v. *Bookman,* 386 Mass. 657, 661 n.5 (1982); *Commonwealth* v. *Best,* 381 Mass. 472, 494-495 (1980); *Commonwealth* v. *Haas, supra* at 552-553; *Commonwealth* v. *Borodine,* 371 Mass. 1, 4-5 (1976), cert. denied, 429 U.S. 1049 (1977). Rarely is any single factor conclusive.

Applying this analytical framework to the defendant's February 2, 1979, confession to the police chief, we note initially that the conversation took place during a friendly chat in the defendant's home with the defendant's voluntary acquiescence. Questioning in such an environment is far removed from the "incommunicado interrogation of individuals in a police-dominated atmosphere" for which the Miranda protections were tailored. *Miranda* v. *Arizona, supra* at 445. Nor is the defendant's late afternoon and early evening conversation with a police chief present at the defendant's invitation in any sense comparable to *Orozco* v. *Texas,* 394 U.S. 324 (1969), in which the Supreme Court held that a suspect awakened and arrested in his bedroom at 4 A.M. by four police officers was "in custody" within the meaning of *Miranda.* We think it clear that, at least up to the point at which Bryant stated, "I did it, I shot him," there was no custodial interrogation.[8] Not only was the

---

[8] The fact that the defendant was given a portion of the Miranda warnings at the outset of the conversation did not make the situation custodial.

defendant in his own home, but the interview itself was informal, and the questioning unaggressive. The police chief had indicated his willingness to leave in order to accommodate the defendant; and although the defendant was a suspect,[9] the investigation was ongoing, was not exclusively focused on the defendant, and there was no probable cause to arrest him.

The defendant asks us to freeze-frame the brief interval after his statement that "I did it, I shot him," and argues that in the fifteen seconds preceding his full confession, there was a change in the atmosphere of the interview of sufficient magnitude to render the situation custodial and trigger the requirement of Miranda warnings. We do not agree.

Although the issue is a close one, we are not persuaded that the interrogation became custodial following the defendant's initial statement, or that immediately thereupon the defendant was "deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra* at 444. "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Oregon* v. *Mathiason,* 429 U.S. 492, 495 (1977).

The defendant's unadorned statement that he had committed the crime undeniably served to sharpen substantially his status as a suspect. We assume that immediately following the statement the police chief had probable cause to arrest Bryant. We also assume, without deciding, that the chief would not have honored a request from the defendant

---

Warnings may be given "out of abundant caution." *Commonwealth* v. *Bookman,* 386 Mass. 657, 660-661 (1982). *Commonwealth* v. *Alicea,* 376 Mass. 506, 513 (1978). We do not rely on these warnings in reaching our conclusion that the interrogation was noncustodial.

[9] The chief suspected a person other than the defendant. The State police lieutenant, who questioned the defendant the day after the homicide, suspected the defendant.

to leave his home. However, we are unable to discern any
fundamental transformation in the atmosphere of the de-
fendant's home in the fifteen seconds between the defend-
ant's initial statement and the more detailed confession. Al-
though the police chief's questioning of the defendant cer-
tainly constituted "interrogation," it was nonaccusatorial,
an inquiry as to whether the suspect had anything more to
say. The police chief did not "bear down" on Bryant.
There is no evidence from which we can conclude that the
defendant was either mentally or physically intimidated.[10]
We do not read *Miranda* v. *Arizona*, fashioned to alert
suspects confined in an adverse environment of their
privilege to resist probing interrogation, to require reversal
where a police officer surprised at a response does not reflex-
ively advise a suspect being interviewed at the suspect's
home of the Miranda warnings immediately upon obtaining
an inculpatory response. Cf. *Commonwealth* v. *Alicea*,
376 Mass. 506 (1978) (while suspect was at police station,
police brought in witnesses who identified him; suspect told
he was in serious trouble and could help himself by confes-
sion); *Commonwealth* v. *Haas*, 373 Mass. 545 (1977) (de-
fendant prevented from entering home, taken to police sta-
tion, informed of deaths of wife and children he was sus-
pected of murdering, and interrogated). Absent record evi-
dence that in the brief gap between the two statements, the
defendant was in fact restrained or reasonably perceived
himself to be restrained,[11] we are not free to conclude that

---

[10] Indeed, the chief said that after the defendant's comment that he shot
Seduski, his (the chief's) knees were knocking, and he (the chief) felt "very
nervous."

[11] The Supreme Court has never endorsed a subjective standard of
"custody," and other courts have explicitly rejected such a test. "Al-
though the officer may have an intent to make an arrest, either formed
prior to, or during the questioning, this is not a factor in determining
whether there is present 'in-custody' questioning. It is the officer's state-
ments and acts, the surrounding circumstances, gauged by a 'reasonable
man' test, which are determinative." *Lowe* v. *United States*, 407 F.2d
1391, 1397 (9th Cir. 1969). *United States* v. *Booth*, 669 F.2d 1231, 1235
(9th Cir. 1981). We likewise adhere to an objective standard.

the police chief's one question had the "compulsive aspect of custodial interrogation." [12]   See *Beckwith* v. *United States,* 425 U.S. 341, 346 (1976),[13] quoting *United States* v. *Caiello,* 420 F.2d 471, 473 (2d Cir. 1969), cert. denied, 397 U.S. 1039 (1970).

The question before us is whether, at any point prior to the termination of the defendant's description of the crime to the police chief, the defendant was under "custodial interrogation" as that term has been interpreted and applied by the United States Supreme Court.   The trial judge was warranted in finding that there was no "formal arrest or restraint on [the defendant's] freedom of movement," *Oregon* v. *Mathiason, supra* at 495, and that the defendant was not "detained against his will," *Beckwith* v. *United States, supra* at 344, until he rendered his full confession.   "It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited" (emphasis in original).   *Oregon* v. *Mathiason, supra.*[14]   The

---

[12] In *Oregon* v. *Mathiason, supra,* the defendant was explicitly told by the police officer who questioned him that he was not under arrest. Mathiason was interviewed in a closed office at a police station, a situation in which, absent the police officer's statement, the conversation might well have been indistinguishable from a custodial interrogation.   We do not believe that the police chief's failure to advise Bryant during a conversation in the defendant's home that he was not under arrest placed Bryant in "the functional, and, therefore, the legal, equivalent of custody." *Beckwith* v. *United States,* 425 U.S. 341, 345 (1976).

[13] In *Beckwith* v. *United States,* 425 U.S. 341 (1976), Internal Revenue Service agents engaged in a criminal investigation and interviewed the suspect in a private home.   Emphasizing that the conversation was "friendly" and "relaxed," and that the agents had not "pressed" Beckwith on questions he chose not to answer, the Supreme Court rejected the contention that the fact that the investigation had focused on the particular suspect created a custodial environment.   Interpreting *Miranda,* the Court stated that "[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning." *Id.* at 346-347, quoting *United States* v. *Caiello,* 420 F.2d 471, 473 (2d Cir. 1969), cert. denied, 397 U.S. 1039 (1970).

[14] In imposing the requirement that custodial interrogation be preceded by warnings to the suspect, the *Miranda* Court relied extensively on police

issue before us is one of Federal law, and we are bound by the Supreme Court's construction of *Miranda's* scope. "[A] state court can neither add to nor subtract from the mandates of the United States Constitution." *North Carolina* v. *Butler,* 441 U.S. 369, 376 (1979). *Commonwealth* v. *Corsetti,* 387 Mass. 1, 4 (1982). *Commonwealth* v. *Cote,* 386 Mass. 354, 360-361 (1982). Thus, even if we infer that the chief's intention to arrest Bryant crystallized immediately following the defendant's statement that "I did it," we believe that, where this intention was in no way communicated to the defendant, *Miranda* does not compel "the rather anomalous result of rejecting an admission made

manuals describing the characteristics of custodial interrogation. The warnings were intended to alert suspects of their rights to terminate interrogation taking place in what one such manual described as "an oppressive atmosphere of dogged persistence." *Miranda* v. *Arizona, supra* at 451, quoting O'Hara, Fundamentals of Criminal Investigation 112 (1956). In that environment, an interrogator would otherwise be free to follow coercive techniques suggested by such manuals: "[The interrogator] must interrogate steadily and without relent, leaving the subject no prospect of surcease. He must dominate his subject and overwhelm him with his inexorable will to obtain the truth. He should interrogate for a spell of several hours pausing only for the subject's necessities in acknowledgment of the need to avoid a charge of duress that can be technically substantiated. In a serious case, the interrogation may continue for days, with the required intervals for food and sleep, but with no respite from the atmosphere of domination." *Id.* In each of the four cases reversed in *Miranda* v. *Arizona* because of the police's failure to apprise the defendants of their constitutional rights, "the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." *Id.* at 457. "In No. 759, *Miranda* v. *Arizona,* the police arrested the defendant and took him to a special interrogation room where they secured a confession. In No. 760, *Vignera* v. *New York,* the defendant made oral admissions to the police after interrogation in the afternoon, and then signed an inculpatory statement upon being questioned by an assistant district attorney later the same evening. In No. 761, *Westover* v. *United States,* the defendant was handed over to the Federal Bureau of Investigation by local authorities after they had detained and interrogated him for a lengthy period, both at night and the following morning. After some two hours of questioning, the Federal officers had obtained signed statements from the defendant. Lastly, in No. 584, *California* v. *Stewart,* the local police held the defendant five days in the station and interrogated him on nine separate occasions before they secured his inculpatory statement." *Miranda* v. *Arizona, supra* at 456-457.

under the same circumstances and conditions as the [initial statement] merely because, as a result of the first [statement], the police would not have permitted [the defendant] to leave, had [he] attempted to do so." *People* v. *Rodney P.*, 21 N.Y.2d 1, 8 (1967).[15]

Because we conclude the defendant's confession was obtained in a noncustodial environment, we find it unnecessary to review the judge's conclusion regarding the adequacy of the police chief's warning to the defendant in the event that the interview was custodial in nature. Without deciding the issue, we observe that the record demonstrates that the defendant was not unaware of his constitutional rights. The judge found that at the beginning of the interview, the chief explicitly told the defendant of his right to remain silent. The defendant thereupon stated that he had already been warned of his rights when he was interviewed in the course of the investigation of the fire at the victim's house and also in the course of a prior interrogation relating to the Seduski shooting. The defendant stated to the chief that he understood his rights. Nevertheless, the chief warned the defendant that anything the defendant said to the chief could be used against him in court. The defendant again said that he understood his rights. Although the defendant was not warned he could have an attorney if he

---

[15] We are not aware of any case suggesting that, because the defendant was arrested immediately following his detailed confession, the questioning took place in a custodial setting. Although the nonarrest of the suspect at the close of the interrogation is often deemed indicative of the lack of a custodial atmosphere during interrogation, see, e.g., *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977) (defendant left police station after a one-half hour interview); *Beckwith* v. *United States*, 425 U.S. 341, 344 (1976) (after questioning at home, defendant not arrested, although arranged to meet officials at business later); *Commonwealth* v. *Best*, 381 Mass. 472, 493 (1980) (defendant not arrested until two years after interview), it does not follow that an arrest after an incriminating statement has been obtained, by itself, labels as custodial the interrogation that precedes the incriminating statement. See *Borodine* v. *Douzanis*, 592 F.2d 1202, 1207 n.3 (1st Cir. 1979); *United States* v. *Hall*, 421 F.2d 540, 545 (2d Cir. 1969), cert. denied, 397 U.S. 990 (1970), aff'd on rehearing en banc, 459 F.2d 454 (2d Cir. 1972).

could not afford an attorney, the chief did inquire as to the defendant's financial status with respect to an attorney. The defendant told the chief that he could afford an attorney, and that "there was no problem." The chief again advised the defendant that he was under no obligation to talk to the chief. Given the defendant's assertions that he understood his rights, and the defendant's statement that "there was no problem" with regard to representation by counsel, we believe that the record does not support an inference that the defendant responded to the police chief's questions under the belief that because of financial hardship he could not have an attorney present at the interrogation.[16]

We conclude that the denial of the defendant's motion to suppress[17] was proper.[18]

---

[16] We emphasize, however, that compliance with *Miranda* v. *Arizona, supra,* requires that a suspect in a custodial setting should be informed explicitly of his right to appointed counsel in the event of indigency, without regard to the suspect's actual financial status.

[17] The defendant also claims that the confessions should be excluded because the police failed to inform him of his statutory right to use a telephone. G. L. c. 276, § 33A. The defendant asserts that inculpatory evidence, obtained from an intentional or unintentional failure to inform an arrested person of his right to use a telephone, should be suppressed. See, e.g., *Commonwealth* v. *Jones,* 362 Mass. 497, 503 (1972). The defendant did not raise this issue at trial or on his first motion for a new trial. The trial judge in denying the defendant's second motion for a new trial concluded that "there is no indication from any source that the right to use the telephone was intentionally denied to [Bryant] at the Newbury police station." As we read the record, there is no evidence of an unintentional denial of the right to use the telephone. No questions were addressed to police officers at the suppression hearing with respect to compliance with G. L. c. 276, § 33A. We are not free to speculate on matters outside the record. Thus, we have no occasion to address the defendant's suggestion that the *Jones* rule of suppression be extended to confessions obtained through unintentional noncompliance with the statute. See *Commonwealth* v. *Meehan,* 377 Mass. 552, 567 (1979), cert. dismissed, 445 U.S. 39 (1980). We note that the initial confessions were obtained at the defendant's home, not at the police station, and, thus, G. L. c. 276, § 33A, would be inapplicable to those statements in any event.

[18] Our decision that the at-home confession was obtained in conformity with the defendant's rights under the Fifth Amendment to the Constitution of the United States disposes of the defendant's contention that his subsequent confessions to the shooting at the police station, which were preceded by full Miranda warnings, should nonetheless be suppressed as "fruit."

2. *Evidence of prior attempts.* The defendant claims that it was error for the judge to admit evidence of his two prior attempts on the victim's life. He argues that the prejudicial effect of the evidence that he set fire to the victim's home, and that he took a shotgun to the dunes across from the victim's house intending to kill him, outweighs the probative value of that evidence. Therefore, he concludes it was an abuse of discretion for the judge to admit this evidence.

The principle on which Bryant relies "is well established: commission of an independent crime cannot be admitted to show commission of the crime charged." *Commonwealth* v. *Imbruglia,* 377 Mass. 682, 695 (1979). *Commonwealth* v. *Baldassini,* 357 Mass. 670, 677-678 (1970). See P.J. Liacos, Massachusetts Evidence 420-423 (5th ed. 1981). However, "the mere fact that evidence tends to prove the commission of some other crime does not render it inadmissible as long as it is relevant to the crime being tried." *Commonwealth* v. *Egan,* 357 Mass. 585, 589 (1970). Thus, "the evidence is admitted if the acts form part of a connected whole establishing knowledge, intent, motive, method, material to proof of the crime charged," *Commonwealth* v. *Murphy,* 282 Mass. 593, 598 (1933), and "provided it is reasonably near in time and [closely] connected with the crime charged in the indictment." *Commonwealth* v. *Stone,* 321 Mass. 471, 474 (1947). *Commonwealth* v. *Imbruglia, supra.*

In this case, the evidence of the prior attempts was properly admitted on the issue of premeditation, an essential element of first degree murder. See *Commonwealth* v. *Haley,* 363 Mass. 513, 523-524 (1973). The evidence was also indicative of hostility and actual malice toward the victim. The attempts took place within two months of the crime charged. "The question of remoteness is largely within the sound discretion of the trial judge, and there is nothing to indicate an abuse of discretion in this regard." *Commonwealth* v. *Baldassini,* 357 Mass. 670, 679 (1970). The judge gave limiting instructions at the time the evidence was introduced and repeated the cautionary charge at the close

of the case. See *Commonwealth* v. *Imbruglia, supra* at 695-696. There was no error.

3. *Determination of voluntariness.* Relying on *Commonwealth* v. *Harris,* 371 Mass. 462, 469-472 (1976), the defendant claims that the judge erred in not conducting a voir dire to determine the voluntariness of his confessions. The defendant asserts that his trial testimony that his confessions were induced by the chief's promise of leniency required the judge on his own initiative to hold a hearing on the issue of voluntariness. The short answer is that the issue of voluntariness was raised and decided during the hearing on the suppression motion.[19] See *Commonwealth* v. *Tavares,* 385 Mass. 140, 151 (1982). The judge found that the confessions were voluntary. The judge instructed the jurors that confessions obtained by a "promise of leniency" are involuntary and must be disregarded. The instructions squarely left the issue of voluntariness to the jury.[20]

There is no merit to the defendant's claim that the fleshing out of his earlier contention of involuntariness required the judge to conduct a second voir dire. A trial judge who hears a claim of involuntariness during a motion to suppress, and who rules on voluntariness, is not obligated to hold a second voir dire on hearing substantially similar testimony at trial.[21]

4. *Prosecutorial misconduct.* The defendant, who had an alibi for the period between 7:03 P.M. and 7:27 P.M. on

[19] The defendant's affidavit and defense counsel's interrogation of the police officers placed the voluntariness of the defendant's statements based on alleged promises of leniency in issue. The police officers denied making any such promises to the defendant. The judge found that "there was no evidence whatsoever of any promise by the Chief; no evidence of any inducement; no evidence of any physical violence or intimidation."

[20] In *Commonwealth* v. *Harris,* 371 Mass. 462 (1976), the record indicated that neither the judge nor the jury considered the voluntariness of the defendant's confession. *Id.* at 467-470.

[21] In instances where, subsequent to a voluntariness voir dire, evidence is introduced at trial that substantially alters the circumstances of the confession, a second voir dire may be required. See *Blackburn* v. *Alabama,* 361 U.S. 199, 210 (1960). See also *Commonwealth* v. *Collins,* 11 Mass. App. Ct. 126, 135 n.10 (1981). This is not such a case.

the evening of the killing,[22] claims that discrepancies between the prosecution's pretrial statements regarding the victim's time of death and evidence as to the time of death presented by the prosecution at trial constitute misconduct violative of his rights to due process and a fair trial. On July 6, 1979, in answer to the defendant's request for a bill of particulars, the assistant district attorney in charge of the Bryant prosecution informed the defendant that the victim had died sometime after 12 P.M. on November 21, 1978. At a pretrial conference on October 11, 1979, defense counsel inquired of the prosecution whether, absent a more specific time of death, he was required to disclose a potential alibi defense. The assistant district attorney thereupon placed the time of death as occurring between 7 P.M. and 7:15 P.M.; defense counsel then stated that he would demonstrate through telephone records that the defendant was at home during that time period. On October 16, 1979, after trial had commenced, the assistant district attorney informed defense counsel that the Commonwealth's evidence would establish that the death occurred around 6:30 P.M. The defendant, arguing that he was "lulled into a false sense of security" by the pretrial representation as to the time of death, and that he was misled in the preparation and presentation of his defense, alleges that the trial judge erred in the denial of his motions for a dismissal of the indictment, a mistrial, and a new trial. We find no merit in this contention.

The defendant does not and cannot contend that evidence of a 6:30 P.M. time of death was exculpatory information that the government was bound to disclose under *Brady* v. *Maryland,* 373 U.S. 93 (1963), and its progeny.[23]

---

[22] Subpoenaed telephone company records evidenced that during those twenty-four minutes a call was made on the defendant's telephone to the home of the defendant's sister in Maine. The defendant's sister testified that she spoke to the defendant during that time.

[23] Due process is violated if the government withholds evidence that is both exculpatory and material to the issue of the defendant's innocence. *Commonwealth* v. *Medina,* 372 Mass. 772, 779 n.3 (1977). *Commonwealth* v. *Pisa,* 372 Mass. 590, 593, cert. denied, 434 U.S. 869 (1977). Evi-

Instead, the defendant's "grievance could be only that the defense was handicapped in repelling [incriminating] evidence" by the prosecution's revised theory as to the time of death.[24] *Commonwealth* v. *Medina*, 372 Mass. 772, 779 (1977).

Although the prosecutor was under no constitutional duty to produce for the defendant evidence damaging to the defendant's case,[25] we agree with the defendant's argument that "the prosecution was at fault in failing to communicate promptly to the defense the changes in [time]." *Commonwealth* v. *Gilbert*, 377 Mass. 887, 892-893 (1979). The attorney's duty does not stop with the first compliance with a defendant's request for disclosure. Changes of substance damaging to the defense must be reported to opposing counsel. *Id.* at 894. See Mass. R. Crim. P. 14 (a), 378 Mass. 874 (1979).[26] However, an application for relief based on prosecutorial misconduct, whether characterized as a sin of commission or omission,[27] must be firmly grounded in a

_____

dence that the crime occurred at a time when the defendant had no alibi is plainly nonexculpatory.

[24] Since the revised time of death "was clearly inculpatory of the defendant, the defendant does not claim that if 'given a timely disclosure, the defense would have been able to prepare and present its case in such a maner as to create a reasonable doubt that would not otherwise have existed.'" *Commonwealth* v. *Cundriff*, 382 Mass. 137, 149 n.19 (1980), cert. denied, 451 U.S. 973 (1981), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980).

[25] See *United States* v. *Agurs*, 427 U.S. 97, 112 n.20 (1976); *Commonwealth* v. *Medina*, *supra*.

[26] The defendant contends that it is inconsistent with the requirements of due process and a fair trial for a prosecutor to make, or leave uncorrected, affirmative statements that are justifiably relied upon by a defendant in a manner that substantially impairs his defense. *Commonwealth* v. *Gilbert*, 377 Mass. 887, 892-893 (1979), and Mass. R. Crim. P. 14 (a), 378 Mass. 874 (1979), describe the prosecution's continuing duty under our criminal discovery rules to divulge information that materially alters information previously conveyed to the defense through discovery. We believe the principles developed in that context to be pertinent to the defendant's due process claim.

[27] The defendant appears to contend that the prosecutor deliberately misinformed defense counsel as to the time of death at the October 11, 1979, pretrial conference. Although we do not condone deliberate decep-

showing of prejudice.[28] *Commonwealth* v. *Cundriff,* 382 Mass. 137, 150 (1980), cert. denied, 451 U.S. 973 (1981). *Commonwealth* v. *Medina,* 372 Mass. 772, 780 (1977). Beyond advancing the conclusory allegation that his defense was impaired by the delayed disclosure of the 6:30 P.M. time of death, the defendant proffers no theory as to how the preparation and presentation of his case would have differed had he received earlier notice, see *Commonwealth* v. *St. Germain,* 381 Mass. 256, 263 (1980); *Commonwealth* v. *Wilson,* 381 Mass. 90, 114 (1980), nor do we perceive any such detriment to the defense causally linked to the belated

---

tion, this claim is of doubtful relevance to the defendant's claim for reversal of his conviction. See *United States* v. *Agurs, supra* at 110 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor"). But cf. *Commonwealth* v. *Pisa, supra* at 594 n.2. In any event, the claim of deliberate deception is unsupported by the record. Although the assistant district attorney had elicited grand jury testimony from the chief of police on February 12, 1979, supportive of a time of death between 6:30 P.M. and 7 P.M., in the circumstances of this case there could only be speculation as to the exact time of death. We agree with the trial judge's finding on the second motion for a new trial that "[u]ntil witnesses testified and were cross examined there could be no absolute time. Time turned on credibility." Moreover, "a prosecutor cannot be expected to appreciate the significance of every item of evidence in his possession to any possible defense which might be asserted by the defendant." *Commonwealth* v. *Pisa, supra* at 595. It was not until defense counsel revealed at the pretrial conference that he intended to put in evidence the defendant's alibi for the half hour after 7 P.M., and that the defendant would testify that he had falsely confessed to shooting the victim at 6:30 P.M., that the significance of the precise time of death became apparent. The fact that the assistant district attorney took five days after receiving notice of the alibi defense to advise defense counsel of the revised estimate of time of death does not establish that the original estimate was deceitful, or that the prosecution deliberately delayed divulging the revised estimate.

[28] In *United States* v. *Agurs, supra,* the Court noted: "[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure. But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 108. We see no reason to apply a different standard to the correction of a prosecutor's affirmative statements.

disclosure.[29]  We note additionally that defense counsel's failure to request a continuance after being informed of the earlier time of death tends to refute the contention that the revelation required a different defense strategy that counsel had insufficient time to prepare.  See *Commonwealth* v. *Baldwin,* 385 Mass. 165, 176 (1982); *Commonwealth* v. *Wilson, supra* at 115; *Commonwealth* v. *Medina,* 372 Mass. 772, 779 (1977).  Since the defendant did not demonstrate any defect in his defense arising from the prosecutor's statements as to time of death, the motions for dismissal, mistrial, and a new trial were properly denied.[30]

5. *Assistance of counsel.*  We turn our attention to the denial of the defendant's second motion for a new trial, based on the ground that he was ineffectively represented by counsel.  The defendant's burden on such a claim is to demonstrate that trial counsel's behavior fell "measurably below that which might be expected from an ordinary fallible lawyer," and, if this first element is established, to show additionally that the attorney's conduct "has likely deprived

---

[29] The defendant's confessions specified that the victim had been shot at 6:30 P.M., as well as the caliber of the shotgun used and the location of the shooting.  Faced with these highly damaging confessions, the defendant testified at trial that he had falsely confessed in order to protect Jane McNeal, after the police chief assured him that if he confessed, the defendant would be subjected only to a thirty-day observation period.  The defendant stated that the police chief appeared to be certain that the shooting had occurred at 7 P.M., and defense counsel introduced in evidence a newspaper article placing the death at that time.  The defendant testified that he confessed to shooting the victim at what he at the time perceived to be an incorrect time so that if the police chief "couldn't come through with his end of the bargain, that would help me in court."  The crux of the defendant's case, and a prerequisite to a jury finding in his favor, was the acceptance of his assertion that he had falsely confessed. Although evidence that the shooting occurred at the time indicated by the defendant in his confession may have affected the jury's evaluation of the credibility of the defendant's elaborate explanation, there is nothing from which we could conclude that a more credible defense would have been available had the defendant received earlier notice of the prosecution's 6:30 P.M. estimate.

[30] The defendant does not claim that, had the time been revised earlier, he would have negotiated a plea.  Cf. *Commonwealth* v. *Gilbert,* 377 Mass. 887, 895 (1979).

the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Accord *Commonwealth* v. *Street,* 388 Mass. 281, 285 (1983). On review of the record, we conclude that the defendant's attack on his representation by trial counsel does not meet the two-pronged test of *Saferian.*

a. *Failure to emphasize alleged inducements.* The defendant claims that his trial counsel failed to focus the judge's attention on the involuntariness of his statements. The defendant alleges that trial counsel should have emphasized one specific claim, that the confessions were involuntary because they were induced by promises of leniency. Counsel, however, did bring this claim out at the suppression hearing through the defendant's affidavit and the interrogation of the police officers. While it is true that the main focus of the hearing was the issue of custodial interrogation,[31] the claim of involuntariness was also explored. The judge's detailed recapitulation of the pertinent evidence in the course of his instructions to the jury indicates that counsel adequately alerted the judge to the testimony pertaining to alleged inducements developed at the suppression hearing and at trial. Given the judge's demonstrated awareness of the inducement question and the submission of the issue to the jury for consideration, we cannot say that counsel's failure to make a fuller inquiry of the witnesses deprived the defendant of the involuntariness defense.

b. *Failure to call witnesses.* The defendant contends that trial counsel's ineffectiveness is established by the defense's failure to procure the testimony of Stephen Smith and Mary Beth Lawlor. At the hearing on the motion for a new trial, the defendant's current counsel introduced as exhibits several police detective interview sheets. One of these exhibits reveals that, on the night of the shooting, Stephen Smith, a neighbor of the victim, related to his father that, "at about 7:00 p.m., he places it at this time due to the Odd

---

[31] The defendant's appeal also focuses more on the issue of custodial interrogation than on the involuntariness of his statements.

Couple having just come on television, he heard what he believed to be a snowball hit the front or side part of the house." Although the importance to the defendant's case of evidence placing the shooting at a time when the defendant was at home talking on the telephone is obvious, trial counsel may well have concluded that Smith's statement about the noise he heard was of minimal probative worth in establishing the time of the shooting. The statement is not on its face of such evidential value as to suggest the conclusion that the failure to call Smith constituted "serious incompetency, inefficiency, or inattention of counsel." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).

The interview sheets describe hypnosis-induced and posthypnotic statements by Mary Beth Lawlor, placing the defendant at the victim's house at 7:30 P.M. on the night of the shooting. Leaving aside the question whether these hypnotically aided statements would have been admissible at the time of the trial, see *Commonwealth* v. *Kater,* 388 Mass. 519 (1983); *Commonwealth* v. *Watson,* 388 Mass. 536 (1983), the defendant has not indicated how testimony placing him at the scene of the crime, albeit at a time later than that suggested by trial testimony, would have helped his cause.

The defendant also challenges trial counsel's failure to call witnesses to impeach the testimony of William Tarmey. At trial, Tarmey testified for the prosecution that on the night of the shooting he left work around 6 P.M. After making a bank deposit he took a fifteen to twenty minute drive home, during which he saw the defendant in the vicinity of the victim's house. After arriving at his house, Tarmey fell asleep, was subsequently awakened by a noise that sounded like a shotgun being fired, and noticed that a clock radio showed 6:35 P.M. In pretrial interviews with Officers Ray, Larcome, Casey, and Pagley, as recorded on interview sheets, Tarmey had made no mention of the clock radio, and had stated that he returned home earlier and heard the shotgun-like noise later than the time Tarmey testified to at

trial.[32]   The defense did not call any of the four officers as trial witnesses to testify regarding Tarmey's prior inconsistent statements.   However, defense counsel cross-examined Tarmey and elicited from him the information that he had previously told the police that he heard the shotgun sound at 7:30 P.M., yet was now claiming to have heard the sound at 6:35 P.M.[33]   The inconsistencies in Tarmey's statements were fully before the jury.   Thus, it is not clear that "better work might have accomplished something material for the defense."   *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).[34]

---

[32] The interview sheets indicate that on November 22, 1978, Tarmey told Officers Ray and Larcome that he had come home at approximately 5:30 P.M., left at 8:15 P.M., and heard a "loud pop" that could have been a shotgun firing at some point in that time span, and that on November 29, 1978, Tarmey stated to Officers Casey and Pagley that he had come home at approximately 5:45 P.M., and heard a shotgun-like report at approximately 7:30 P.M.   Chief Tuney's notes of a January 30, 1979, interview with Tarmey indicate that, on that date, Tarmey's recollection as to the time he left work and drove home conformed to his testimony at trial, but that Tarmey did not mention the clock radio.

[33] On cross-examination, Tarmey's recollection was that he told Chief Tuney that he heard that sound at 7:30 P.M.   Tarmey did not remember making such a statement to Officers Casey and Pagley.   See note 32, *supra*.

[34] The defendant also argues for reversal on the ground that the prosecution knowingly permitted Tarmey to perjure himself at trial.   See *Napue* v. *Illinois*, 360 U.S. 264, 269 (1959); *Commonwealth* v. *Daigle*, 379 Mass. 541, 546 (1980).   The sole basis for these serious allegations about the witness and the prosecution is an assertion in the defendant's brief that "[i]t is truly preposterous to think that this witness could have overlooked the digital-clock radio in his previous interviews."   Allegations of perjury must be supported by concrete factual evidence.   Absent such evidence, we will *not indulge the defendant's invitation to speculate re-garding the veracity of testimony.

For the same reason, reversal is not merited by the defendant's characterization as "incredible" of Lieutenant Duemling's testimony at the trial that in the course of the investigation he had never seen telephone records establishing that a telephone call was made on the defendant's telephone from 7:03 P.M. to 7:27 P.M. on the night of the shooting, and that he was unaware that such records had been subpoenaed.

The defendant does point to grand jury minutes containing testimony by Chief Tuney that, as of February 2, 1979, the defendant "was the

c. *Jury instructions and closing argument.* Counsel's failure to request instructions requiring the jury to find that the defendant's confessions were obtained in compliance with Miranda standards does not, as the defendant alleges, demonstrate incompetency, since such instructions are not required. *Commonwealth* v. *Tavares,* 385 Mass. 140, 153 n.19 (1982).[35] Nor do we agree with the defendant's charge that defense counsel "threw in the towel," in his closing argument to the jury. Although counsel did state that the average person would not be impelled by an unrequited love to confess falsely to a murder, counsel's argument as a whole did not undermine the defense. Counsel's tactic was to focus the jury's attention on the defendant's subjective state of mind at the time he confessed, and to argue that, while others in similar circumstances would not have claimed responsibility for a crime they had not committed, the defendant's assertion at trial that he had done so was credible.

The defense was clearly linked to the credibility of the defendant's explanation of his written confession. Therefore, it was not "manifestly unreasonable," *Commonwealth* v. *Rondeau,* 378 Mass. 408, 413 (1979), for counsel to perceive that the defendant's testimony was not plausible on its face, and, conceding this, to argue to the jury that the defendant's mental framework was different enough from the norm as to give credence to his explanation. We will not

---

prime suspect" as evidence that the police chief testified falsely at the suppression hearing, and at trial when he stated that on that date someone other than the defendant was his prime suspect. The chief's full testimony at the suppression hearing, however, was that the defendant was the prime suspect of Lieutenant Duemling, who was in charge of the investigation, but not the chief's prime suspect. Read in context, the statements pointed to by the defendant do not support the allegation of perjury.

[35] The defendant also claims that it was error for the judge to instruct the jury not to consider whether the defendant's confessions were obtained in compliance with *Miranda* v. *Arizona, supra.* The instruction was not objected to at trial, and we review it only for a substantial risk of a miscarriage of justice. We find none here. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 153 n.19 (1982).

second guess such a tactical judgment. *Commonwealth* v. *Rondeau, supra.*

6. *Review under G. L. c. 278, § 33E.* Our examination of the record reveals no basis for exercising our statutory power to order a new trial or direct the entry of a verdict of a lesser degree of guilt. We have considered the legal challenges to determine if, even in the absence of reversible error, there is a substantial likelihood that a miscarriage of justice has occurred. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 149. We only reverse on a showing of grave prejudice. *Id.* We find "no such question about the fundamental fairness of the result as would entitle us to act under the statute." *Commonwealth* v. *Ravida,* 371 Mass. 243, 248-249 (1976).

> *Order denying motion for*
> *new trial affirmed.*
>
> *Judgment affirmed.*