Toomey, J.
BACKGROUND
The Worcester County Grand Jury returned two indictments accusing defendant of conspiracy to commit an assault and battery by means of a dangerous weapon and conspiracy to violate constitutional rights.[1]
Defendant has offered a motion to suppress certain statements he made to agents of the Commonwealth. He asserts that those statements were elicited in violation of his several constitutional rights. More specifically, he claims that the statements were procured by the Commonwealth in a manner contrary to the requirements of Miranda v. Arizona, 384 U.S. 436 (1966), and were involuntary. For the reasons stated infra, I find merit in defendant’s contentions and I allow the motion to suppress.
FACTS
After evidentiary hearing, at which was received the testimony of witnesses and certain documentary exhibits, I find the following facts:
1. On August 12, 1993, defendant was on duty as a correction officer at the Worcester County House of Correction. He was relatively junior in his position and had been employed as a correction officer for approximately three years.
2. In his position as a correction officer, defendant was required, by official policy and prevailing practice, to obey the commands of superior officers. The orientation and organization of tire Sheriffs Office which *531 staffed the Worcester County House of Correction was decidedly paramilitary in character.
3. At approximately 8:00 a.m., defendant received a telephone call, at his assigned station within the House of Correction, from Assistant Deputy Superintendent Kevin Foley. As Director of the Special Services unit at the House, Deputy Foley was in charge of internal investigations and was superior to defendant in rank, experience and position. The call “requested” defendant to report immediately to Deputy Foley’s office. Under the circumstances, that “request” was an order compelling defendant to obey. Failure to obey would have resulted in some negative impact upon the employment status and prospects of defendant.
4. Defendant was escorted to Deputy Foley’s office by First Assistant Deputy for Operations Gabriel, one of whose duties was director of internal security. Deputy Gabriel was the superior of defendant. The two walked to the Special Services building where Deputy Foley waited. Entrance to the building was gained by Deputy Gabriel’s signalling a control officer to unlock the door: the two entered and the door closed behind them, automatically locking. Exit could be effected only by key or by a control officer’s triggering the unlocking mechanism.
5. Deputy Gabriel led defendant to a coffee room in the vicinity of Deputy Foley’s office. Although Deputy Gabriel never “ordered” defendant to accompany him to the Special Services building or to Deputy Foley’s office, the attendant circumstances rendered Deputy Gabriel’s escorting of defendant tantamount to an order.
6. Lieutenant Bove took over escort duty from Deputy Gabriel and showed defendant into Deputy Foley’s office. The door was shut after defendant entered.
7. Deputy Foley was a former West Boylston Police Officer and retained, in his present capacity, the authority to arrest.
8. In the office defendant noted the presence of, in addition to Deputy Foley, Lieutenant Coggans, a criminal investigator present as an “observer” and a Ms. Yell, an employee of Special Services present as a note taker. Both Lieutenant Coggans and Ms. Yell were there at the request of Deputy Foley. Lieutenant Coggans, a former Worcester Police Officer, had a holstered handgun on his belt.
9. Deputy Foley directed defendant to sit. Defendant was positioned in front of Deputy Foley with lieutenant Coggans to defendant’s side and Ms. Yell to his rear. Defendant knew Deputy Foley by virtue of his position, but had never before met him or been in the office.
10. Deputy Foley prefaced his interrogation of defendant by reciting a “broad overview” of the situation relative to an inmate’s complaint that he had been beaten by other inmates acting in complicity with corrections officers. The “overview" included Deputy Foley’s comment that the matter was a “felony,” was “serious,” would be reported to the “D.A.” and might be brought to the attention of the “Grand Jury.”
11. Defendant’s responses to the initial interrogation were largely uninformative and Deputy Foley halted the questioning to caution defendant “to be honest.” Defendant began to cry.
12. The interrogation resumed and, as defendant claimed ignorance of the matter, Deputy Foley again suspended the questioning to encourage more candor from defendant. Deputy Foley repeated his counsel that the matter was “serious,” “criminal charges could occur" and that defendant had “to be honest." The deputy added that he and the sheriff could “help” the defendant only if he would “cooperate.” There was no “friendly chatter” during the interrogation.
13. Deputy Foley believed that defendant “had to” answer his questions and that, depending upon his answers, the Deputy would consider referring the matter to the District Attorney and the Grand Jury.
14. The interrogation progressed and, at its conclusion, Deputy Foley revealed that he had known “that the inmate went to the hospital and implied [defendant] was involved by his [the inmate’s] statement.” The Deputy “strongly recommended that [defendant] get an attorney.”
15. Defendant was permitted to depart: Lieutenant Coggans unlocked the door of the Special Services building, and defendant returned to his duty station.
16. The room adjacent to Deputy Foley’s office was customarily used for the interrogation of criminal suspects. While defendant was being interrogated in the office, the inmate-victim was seated in that room. From time to time during the interrogation of defendant, Deputy Foley alluded to the victim’s presence next door and told defendant that the victim was “ratting him out.”
DISCUSSION
Although the facts that defendant was himself a law enforcement officer (and thus, presumably, less susceptible to the coercive consequences of locked buildings and closed doors in a House of Correction) and that he was permitted to leave after the interrogation had terminated suggest that the interrogation was not “custodial” in the usual sense, the surpassing effect of the totality of the other facts at bar compel the conclusion that the instant interrogation was indeed one conducted during a government-imposed restriction upon defendant’s freedom of action. In reaching that conclusion, this court has employed an objective standard, Commonwealth v. Tart, 408 Mass. 249, 258 (1990), to determine whether the defendant’s freedom of movement was restrained to the degree commonly associated with a formal arrest. Miranda v. Arizona, 384 U.S. 436, 444 (1966). See also, Smith, Criminal Practice and Procedure, 30 Mass. Prac. §336 and cases there cited.
Custody, vel non, is determined “from the point of view of the person being questioned” and focuses upon *532 whether “the investigation took place in a coercive atmosphere.” Commonwealth v. King, 33 Mass.App.Ct. 905, 906 (1992), quoting from Commonwealth v. Bryant, 390 Mass. 729, 736 (1984). See also, Commonwealth v. A Juvenile, 412 Mass. 275, 277 (1988) (“the test is how a reasonable person in the [defendant’s] position would have understood his situation”). The intent of the interrogator with respect to whether or not the suspect was free to leave is immaterial. Commonwealth v. Shine, 398 Mass. 641, 648 (1986); Commonwealth v. Ferrara, 31 Mass.App.Ct. 648, 653 (1992). Rather, we view the landscape from the vantage of the mythic reasonable person subjected to interrogation. Berkemer v. McCarthy, 468 U.S. 420, 422 (1984); Commonwealth v. Bryant, 390 Mass. 729, 736 (1984).
Even though the entirety of the attendant facts are to be assayed by the motion judge, the law has directed that a judge concentrate upon certain particular circumstances in aid of the application of the objective standard. Those circumstances include the place of questioning, the focus of the investigation, the dominance of the interrogator and the immediate consequence to the suspect of his divulging incriminating information. Commonwealth v. Bryant, 390 Mass. 729, 736 (1984). At bar, a review of those pertinent circumstances results in a heavy tilt in favor of the conclusion of custody.
First, the locus of the interrogation was thé office of defendant’s superior, an officer charged with the responsibility of conducting criminal and internal investigations. Defendant had been escorted to the area by a senior officer. Defendant was led into the office by another senior officer. Awaiting him was an armed “observer” and a note taker. The door was closed behind him. He could not leave the building unless control officers unlocked the exit. He was interrogated by one to whom, by reason of defendant’s training and organizational mandate, he owed a duty of obedience. The sense of isolation and coercion occasioned by those circumstances would necessarily have caused a reasonable person in defendant’s position to conclude that he was not free to leave Deputy Foley’s office. United States v. Washington, 431 U.S. 181 (1977); Commonwealth v. Haas, 373 Mass. 545, 552-53 (1977).
Second, although Deputy Foley has insisted that the investigation had not narrowed upon defendant at the time of the interrogation, the facts suggest otherwise. The nature of the interrogation — which was repetitively interrupted, when defendant protested his ignorance, to enable Deputy Foley to urge defendant to be more forthcoming and to be aware of his peril— and the deputy’s comments to defendant that “the inmate went to the hospital and implied [defendant] was involved” and “several other officers [were] aware of what was going on and that the gates were left open” both suggest that the deputy’s suspicions had come to rest squarely on defendant. The several references by Deputy Foley to “felony,” “serious matter,” “District Attorney,” the “Grand Jury” and the need for defendant “to be honest” demonstrate further that indeed the deputy felt himself in possession of sufficient information to focus at least a portion of his investigation on defendant. Thus, the “focus” aspect of the Bryant analysis supports the finding of custody. Commonwealth v. A Juvenile, 402 Mass. 275, 278 (1988).
Third, the persistence and aggressiveness of the interrogator and the lack of control by defendant militate in favor of the custody conclusion. From the preliminary comments of Deputy Foley, his pointed questions, and his interruptions, when defendant claimed ignorance, to urge candor and suggest consequences, it is clear that the interrogation process was formal, domineering and relentless. Those qualities are evocative of custody. Commonwealth v. Philip S., 32 Mass.App.Ct. 720, 726 (1992).
Finally, Bryant would have us look to whether, at the time of the incriminating response, the defendant was free to leave the locus of the interrogation. At bar, defendant was not arrested after voicing the admissions now sought to be suppressed. That omission is, concededly, a poor fit with a finding of custody. Commonwealth v. Bryant, 390 Mass. 729, 736 (1984). Nevertheless, I am persuaded that, notwithstanding his release, at the time of his admission a reasonable person in defendant’s “shoes” would not have felt himself free to leave the room. The eventual release, while some evidence of non-custody, pales in comparison with the contrary evidence of custody.
In sum, the locked doors, the armed “observer,” the superior-inferior relationship, the threatening questioning, the focus on defendant’s involvement and the paramilitary character of the Sheriffs Department leave little room for dispute on the custody question. A reasonable person in defendant’s circumstances would not have felt himself free to leave during the instant interrogation.'
CONCLUSION
Defendant was deprived of his freedom in a significant way at the time Deputy Foley interrogated him. Accordingly, before the product of that interrogation may be received into evidence, the Commonwealth must demonstrate that defendant knowingly, intelligently and voluntarily waived his constitutional rights with respect to counsel and self-incrimination. Because there is no evidence that defendant was informed of those rights, no such waiver has been established at bar. Miranda v. Arizona, 384 U.S. 436 (1966). The motion to suppress is, therefore, ALLOWED.[2]

 A third indictment, by which defendant was accused of the object offense of violating constitutional rights, is not now before the court because the Commonwealth has not moved for trial thereupon.

 Because of my determination that suppression is required for Miranda reasons, I do not reach defendant’s alternative contention that his statement was involuntary.