COMMONWEALTH vs. GEORGE CHRISTOPHER MACNEILL.

Essex. September 11, 1986. — January 16, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Waiver*. *Evidence*, Admissions and confessions. *Homicide*.

With respect to a defendant's motion to suppress from evidence his signed confession to murder, made to police officers when he was sixteen years and eight months of age and in the presence of his grandfather, in whose home the defendant had been found, a judge, following a hearing, was warranted in finding beyond a reasonable doubt that the defendant, after receiving Miranda warnings, had waived his rights intentionally and without any form of coercion, and it was without consequence that the defendant did not actually seek or receive the advice of his grandfather, whose mental capacity was not shown to have been impaired at the time of the defendant's interview with police. [74-79]

INDICTMENT found and returned in the Superior Court Department on February 1, 1982.

A pretrial motion to suppress evidence was heard by *Peter F. Brady*, J., and the case was tried before him.

*Peter D. Feeherry* for the defendant.

*Lila Heideman*, Assistant District Attorney (*George M. O'Connor*, Assistant District Attorney, with her) for the Commonwealth.

O'CONNOR, J. In this appeal from a conviction of murder in the first degree, the defendant argues that the denial of his motion to suppress his signed confession to the police, made in the presence of the defendant's grandfather when the defendant was sixteen years old, was error. The defendant also seeks relief under G. L. c. 278, § 33E (1984 ed.). We affirm the conviction.

The challenged confession is contained in a report prepared by Lieutenant Alfred Duemling of the State police. The report

is signed by the defendant and his grandfather, and by Duemling and Lynn police Lieutenant Joseph Coppinger as witnesses. The contents of the confession bear on the question whether the defendant knowingly, intelligently, and voluntarily waived his rights protected by the Fifth Amendment to the United States Constitution before making the confession. Furthermore, because we answer that question in the affirmative, the confession is relevant to our consideration of the entire case under G. L. c. 278, § 33E, to see whether justice requires a change in the verdict. *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 749 (1975). According to the report, the defendant initially denied that he had killed Bonnie Mitchell, the victim. He accounted for his whereabouts during the relevant time period in considerable detail. The report then states that the police told the defendant in the presence of his grandfather that the defendant was not telling the truth, and that several people had told the police that the defendant had shown them the victim's body and had told them that he had killed her. The rest of the report is as follows: "We asked him to stop lying and tell us the truth. He then stated, 'Yes, I killed her, I told her to stay out of my life but she wouldn't.' 'She had other girls beat up my girl.' 'Sunday I thought about killing her and I thought of strangling her with a rope.' 'Sunday I found a rope at Cook Street Park and I was going to use it. I put it in my coat and took it home.'

"I got up at 7:45 A.M., took a bath and left the house about 9:00 A.M. or so and went to my mother's house. On the way down I threw the rope away. I left my mother's about 9:40 A.M. I walked to Frank's house on Rock Avenue. My mother lives at 7 Essex Circle. It took me about 10 minutes to walk there. On the way I picked up another length of rope in a parking lot on Brownville Avenue. It was about two or two and half feet long. It was like clothes line rope. I put it in my pocket. I didn't know if I was going to go through with it or not but I still had the rope. I had thrown the other rope away because I had changed my mind at that time.

"At Frank's house I was talking with Billy and Melissa Bragen. Bill had some pot and we smoked it, Bill and I. Bonnie

came and I asked her to go for a walk with me. I had decided to kill her, we went to the Pine Grove. Sunday I had thought about killing her at the Pine Grove because it was close. At the Pine Grove we walked to the little bathroom and she wanted to see what was inside. I knew the house was there from a while. ago. She wanted to stay inside because she was cold. We were in there about 45 minutes talking about why she wanted to beat and kill Tracy. She told me that, 'If she couldn't have me no one could, and if she couldn't beat them up she would get someone to do it for her.' At that time she was sitting on the hopper and I was on the ledge above her with my feet on the opposite window and I was behind her, I had made up my mind to kill her, it was now or never. I took the rope out of my pocket and one foot on the hopper, my left, and my right knee in her back. I had one end of the rope in each hand and put it around her neck. I pulled the rope around her neck and held it for 3-4 minutes. She attempted to get her finger under the rope but couldn't. She didn't make any noise. I let go of the rope and she fell on the floor. The rope was still around her neck and I took the ends and tied them to the hopper seat. I did this because I read in a book that if you strangle someone and don't hold it long enough they are just unconscious. So I thought if I tied the rope from her neck to the hopper and she woke up she would strangle herself. I wanted to make sure I killed her. I didn't hate her, I just loved my girlfriend and I didn't want to lose my baby.

"I told my friends that I killed her and they didn't believe me. So I told them where the body was and they saw her, Tracy, Bill Newhall, Ted, Darryl. I went back to Tracy's house and we met John Davis and I told him that I killed her. He asked me and I told him. Tracy told me that she felt sick."

As further background, especially in connection with our duty to determine whether the conviction ought to be reduced, we note that, at trial, several Commonwealth witnesses essentially corroborated, and also supplemented, the defendant's confession. The witnesses testified that on the day of the killing and on the previous day the defendant told his friends that he intended to kill Mitchell, his former girl friend, because she

had threatened his current girl friend whom he believed to be pregnant.

The defendant testified at the trial. He denied that he had killed Mitchell. He said that another person killed her in his presence, and that that person threatened him with a gun and told him to say that he, the defendant, had killed Mitchell. The defendant testified that, later, Mitchell's killer told him that he would kill the defendant's current girl friend if the defendant did not confess to Mitchell's killing.

We now specifically turn our attention to the motion to suppress the confession. The defendant's contention is that the Commonwealth has failed to sustain its heavy burden of showing that he waived his Fifth Amendment rights voluntarily with an understanding of their nature and the possible consequences of waiving them. *Miranda* v. *Arizona*, 384 U.S 436, 475 (1966). *Commonwealth* v. *Cameron*, 385 Mass. 660, 664 (1982). *Commonwealth* v. *Garcia*, 379 Mass. 422, 428-431 (1980). "Special caution, of course, must be exercised in examining the validity of inculpatory statements made by juveniles." *Commonwealth* v. *King*, 17 Mass. App. Ct. 602, 609 (1984). *Commonwealth* v. *Cain*, 361 Mass. 224, 228 (1972).

The judge found the following facts beyond a reasonable doubt. At approximately 9:35 P.M. on October 19, 1981, Lynn police officers met the defendant and his grandfather at the building where the grandfather lived.[1] The police and the grandfather made an unsuccessful effort to find the defendant's mother. At around 10 P.M. on the same night, Lieutenant Alfred Duemling of the State police went to the grandfather's apartment and told the defendant and the grandparents that his visit concerned the death of Mitchell. Duemling noticed nothing wrong with the grandfather's speech or behavior. The defendant and his grandfather were asked to go to the police station. They went there in a police cruiser, and at 10:30 P.M. Duemling, Lieutenant Coppinger, the defendant, and the defendant's

---

[1] The uncontroverted evidence adduced at the suppression hearing was that the grandfather was sixty-eight years old.

grandfather went into a small room containing a table and four chairs. The door was closed.

The judge found that Duemling told the defendant and his grandfather that he was investigating Mitchell's death and that he had heard that the defendant was involved. Duemling then read the Miranda warnings to the defendant and the grandfather. After being asked if he understood his rights, the defendant replied that he did and that he wanted to talk to the police. The grandfather also responded that the defendant could talk to the police. The defendant and the defendant's grandfather read the Miranda card and signed it. The defendant, the judge found, "then gave a cogent and detailed statement" denying any involvement with Mitchell's death, but, when Duemling told the defendant to stop lying, the defendant stated that he did kill her "and went on with a detailed explanation of why and how he killed her." When the confession was completed, the defendant and the grandfather signed it, as did the officers as witnesses. The interrogation lasted one hour, during which the defendant was not under the influence of drugs or alcohol. He had been given a soft drink during the interrogation, and he remained unemotional and "exhibited no unusual signs" during that time. At 11:45 P.M. the defendant telephoned his mother.

The judge found that the defendant was born on February 17, 1965 (making him sixteen years and eight months old at the time of the incident), that he had gone no further in school than completion of the eighth grade, and that he left school because the teachers were not giving him enough work (the defendant had so testified). The judge also found that the defendant had never before been arrested or been in a police station, and that, while being held awaiting trial, the defendant "pretended to be attempting to commit suicide in order to be transferred to Bridgewater where he sought to study law books." The judge further reported that he had "observed the defendant on the stand, and he appeared bright and answered the questions with appropriate responses. He appears to be stoic in his mannerisms and countenance." After explicitly acknowledging the Commonwealth's heavy burden of proving

a knowing, intelligent, and voluntary waiver of a defendant's constitutional rights, and that for a waiver the defendant must understand "the import of each Miranda warning," the judge, expressly employing "special caution" in view of the defendant's youth, concluded beyond a reasonable doubt that the defendant intentionally and without any form of coercion relinquished his Fifth Amendment rights.

In the absence of clear error, we accept the judge's subsidiary findings. *Commonwealth* v. *Corriveau*, 396 Mass. 319, 326 (1985). Also, we give substantial deference to a judge's ultimate findings. *Id.* Of course, we must make our own determination of the correctness of the judge's application of law to his or her findings. *Id.* In this case, the judge's subsidiary findings were clearly warranted by the evidence, and no reason appears for rejecting his ultimate findings. The judge correctly applied the law.

The defendant relies on *Commonwealth* v. *A Juvenile*, 389 Mass. 128 (1983), decided several months after this case was tried, and argues that the several requirements for a valid determination that a juvenile has waived his Fifth Amendment rights announced in that case apply to this case as well, and that they were not met. Specifically, the defendant argues that the police failed to make an adequate effort to have his mother, instead of his grandfather, present with him at the police station, and that this failure may have prejudiced his rights. He further argues that the judge failed to find that the grandfather understood the defendant's rights and the possible consequences of waiving them, and that the defendant and the grandfather engaged in no discussion about those matters.

In *Commonwealth* v. *A Juvenile*, *supra* at 133-134, we said: "In those jurisdictions which have adopted the 'interested adult' rule, the courts have generally held that to demonstrate a knowing and intelligent waiver by a juvenile the State must first prove that the juvenile and his parent, or if a parent is not available, someone in loco parentis, were fully advised of the juvenile's right against self-incrimination through administration of the standard Miranda warnings. See, e.g., *Commonwealth* v. *Smith*, [472 Pa. 492, 497 (1977)]. We conclude that,

for the Commonwealth successfully to demonstrate a knowing and intelligent waiver by a juvenile, in most cases it should show that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of waiver of these rights. For the purpose of obtaining the waiver in the case of juveniles who are under the age of fourteen, we conclude that no waiver can be effective without this added protection. This procedure reflects our assumption that an informed parent, or person standing in loco parentis, will be better able to understand the child's rights, rights which a child of such tender years is unlikely to comprehend fully without the assistance of such a person. For cases involving a juvenile who has reached the age of fourteen, there should ordinarily be a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent. For a waiver to be valid without such a consultation the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." (Footnote concerning the retroactivity of the per se rule applicable to juveniles under fourteen omitted.) The standards we set forth in *Commonwealth* v. *A Juvenile, supra,* for assuring that a juvenile defendant who has reached fourteen years of age has knowingly, intelligently, and voluntarily waived his Fifth Amendment rights have been met in this case.

In *Commonwealth* v. *A Juvenile, supra,* we specifically allowed for someone other than a parent, such as a grandfather, to be present with the juvenile. Of course, deliberate police avoidance of a parent's participation in an exchange between the police and a juvenile ordinarily would be highly suspect, but no such conduct is indicated here. At best it may be said that the search for the defendant's mother does not appear to have been extensive, but we have not announced minimum search requirements, and we are not inclined to do so. In the absence of contrary indications, it is fairly inferrable that a grandfather in whose home a juvenile is found, and who accompanies the juvenile to the police station, is sufficiently interested

in the juvenile's welfare to afford the juvenile appropriate protection.

It is true that the judge, not having the benefit of our decision in *Commonwealth* v. *A Juvenile*, 389 Mass. 128 (1983), did not specifically find that the defendant's grandfather understood the Miranda warnings. However, the judge did focus on the grandfather's mental capacity. He found that Lieutenant Duemling noticed nothing wrong with the grandfather's speech or behavior immediately before the trip to the police station, and in his memorandum of findings, the judge explicitly stated that he disbelieved the grandfather's testimony at the suppression hearing that he was drunk at the police station and knew very little about what had happened. Furthermore, the judge found that Duemling read the Miranda warnings to the grandfather, who subsequently read and signed the Miranda card. Nothing more need be shown to demonstrate that the presence of the grandfather gave the defendant a realistic opportunity to get helpful advice if he needed it.

The facts that the defendant did not actually seek his grandfather's advice and that his grandfather did not expressly offer it, are without consequence. It is the juvenile's opportunity to consult that is critical, not whether he avails himself of it. That opportunity was present here. Without the benefit of context, our statement in *Commonwealth* v. *A Juvenile, supra* at 134, that "[f]or cases involving a juvenile who has reached the age of fourteen, there should ordinarily be a meaningful consultation with the parent, interested adult, or attorney," might suggest that a mere opportunity for a consultation without a consultation actually taking place is insufficient, but the context makes clear that no more than genuine opportunity is required. Both before and after the quoted language, the opinion explicitly speaks of the importance of the defendant's having an "opportunity" to consult with an adult. In the Pennsylvania case on which this court relied in *A Juvenile*, the court held that opportunity is enough, *Commonwealth* v. *Smith, supra* at 502-503, rejecting the view, expressed in a concurring opinion, that there can be no waiver in the absence of an actual consultation. *Commonwealth* v. *Smith, supra* at 506 (Manderino, J.,

concurring). Furthermore, the ultimate question is whether the juvenile has understood his rights and the potential consequences of waiving them before talking to the police. The choice of a sixteen year old juvenile not to consult with an available friendly advisor concerning those matters suggests that the juvenile's understanding was such that consultation was unnecessary. We conclude, therefore, that the judge's determination that the defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment rights was well warranted even if we take the view that the judge's findings do not amount to findings of "a high degree of intelligence, experience, knowledge, or sophistication" on the defendant's part. *Commonwealth* v. *A Juvenile, supra* at 134. Accordingly, we perceive no error in the denial of the defendant's motion to suppress.

In addition to the defendant's claim that the denial of his motion to suppress was error, he seeks reduction of the conviction pursuant to G. L. c. 278, § 33E. We have considered the entire record, including the confession, and we are satisfied that the interests of justice would not be served by our granting relief under G. L. c. 278, § 33E.

*Judgment affirmed.*