COMMONWEALTH *vs.* CHRISTOPHER BERRY.

Essex. April 2, 1991. - May 7, 1991.

Present: LIACOS, C.J., NOLAN, LYNCH, & GREANEY, JJ.

*Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Parent and child. *Evidence*, Admissions and confessions. *Waiver*.

The record of a hearing on a criminal defendant's motion to suppress his statement to police, made when he was a juvenile, demonstrated that the defendant had an opportunity for a meaningful consultation with his father and that he understood his rights and the potential consequences of waiving them before he gave his statement. [34-37]

INDICTMENTS found and returned in the Superior Court Department on December 21, 1988.

A pretrial motion to suppress evidence was heard by *John L. Murphy, Jr.*, J.

Leave to appeal was allowed by *O'Connor*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Robert J. Bender*, Assistant District Attorney (*Gerald P. Shea* with him) for the Commonwealth.

*Michael P. Hickey* for the defendant.

GREANEY, J. After the defendant, while a juvenile, was indicted for murder in the first degree and breaking and entering with intent to commit a felony, he moved to suppress a statement he had made to the police. A judge of the Superior Court allowed the defendant's motion. A single justice of this court granted the Commonwealth's application for interlocutory appeal. We now reverse.

We summarize the motion judge's findings of fact, with some supplementation from the record. Late in the evening of December 26, 1987, the defendant (then aged sixteen years, four months) returned home to his family's apartment.

His father, Malcolm Berry (Berry), was there, and he suspected that earlier in the evening the defendant and his friends had been drinking, using drugs, and fighting in the apartment.

Berry confronted the defendant, and an argument ensued. Berry called the police, but they did not respond. The argument then turned violent; Berry slapped the defendant, wrestled with him, and forcibly ejected the defendant from the apartment. Upset, the defendant broke the glass in the back door. Berry again called the police, but by the time they arrived, the defendant was gone. Berry also called his Alcoholics Anonymous "sponsor," who came to the apartment, remained with Berry until later in the morning, talked about the situation with him, and helped him begin to calm down.

The defendant returned home about 2 A.M. There was no further confrontation or violence, but Berry again summoned the police. When the police arrived, they informed Berry that they could not remove the defendant unless he had threatened Berry's life. Berry then prepared and signed a statement in which he claimed that the defendant had threatened to kill him. (That particular claim was false. Berry later admitted that the defendant had made no such threat.) Berry also told the supervising officer that he believed that the defendant had ingested drugs and alcohol earlier in the evening.

At this time, roughly 2:30 A.M. on the morning of December 27, the supervising officer had observed both Berry and the defendant. The officer considered Berry to be sober, and the defendant oriented and not under the influence of drugs or alcohol.

The defendant was taken to the police station and placed in the juvenile room, where he spent the rest of the night. About 9 A.M., Berry received a telephone call from the police station; he was informed that the defendant would be released soon.

At about 1 P.M., Berry received another telephone call from the police. This time he was advised that the defendant was being charged with murder, and he was instructed to

bring clothing for the defendant to the station. The defendant was booked at about 1:45 P.M. No questions were asked of him regarding the alleged crime during this process, and an onlooking officer detected no odor of alcohol on the defendant's breath, nor any unusual behavior. In fact, the defendant appeared normal and unconfused, and he answered questions appropriately during the procedure.

Berry arrived with clothing for the defendant and was present when his son's clothes were taken from him. The defendant and Berry spoke alone in the juvenile room for fifteen to twenty minutes, during which time Berry told the defendant that he loved him, and would stay with him. A detective at the police station spoke with Berry for a few minutes, and he appeared normal. Berry was sober at the time. After his visit with his son, Berry returned home.

Sometime later, the defendant told one of the detectives that he wanted to make a statement. The detective immediately telephoned Berry and asked him to come to the station because the defendant wanted to talk. Berry arrived in minutes.

Until Berry arrived, the police scrupulously avoided talking to the defendant, and no statements were taken. Upon Berry's arrival, the detective read a card containing the Miranda warnings to both Berry and the defendant. Both stated that they understood the warnings, and both read and signed the card. There was no discussion at this time between Berry and the defendant. The defendant then gave an incriminating statement.[1]

The police did not use force, intimidation, or trickery to obtain the defendant's statement. In fact, the motion judge noted that the police treated the defendant properly, and with "meticulous concern" for the defendant's rights. As for

---

[1]In his statement, which was given in oral narrative form, the defendant admitted to breaking and entering a house in the area in which he lived. The victim was found murdered in the house, which had been burglarized. The statement links the defendant to the burglary and places him in the dwelling where the victim was found.

Berry, however, at the time that the defendant gave his state-
ment, Berry was upset, and felt "in a daze" and "out of it."

Based on these facts, the motion judge found that, because
of his upset condition, Berry was emotionally and mentally
unable to assist the defendant in evaluating the significance
of making a statement to the police. The judge therefore con-
cluded that "the Commonwealth has failed to sustain its
heavy burden of demonstrating that the [defendant's] state-
ment . . . was made after an opportunity for a meaningful
consultation with his father wherein his rights were explained
to him in such a way that he understood the significance of
waiving his rights."

In reviewing the Superior Court's decision, we accept the
motion judge's subsidiary findings of fact. However, we make
an independent determination of the correctness of his appli-
cation of constitutional principles to the facts as found. See
*Commonwealth* v. *Libran*, 405 Mass. 634, 639 (1989); *Com-
monwealth* v. *A Juvenile*, 389 Mass. 128, 135 (1983). There
is no material dispute over the facts as found. The Common-
wealth contends that the judge's conclusion was incorrect as
a matter of law. The defendant emphasizes the judge's find-
ings concerning Berry's mental and emotional distress (due
both to the violent confrontation of the night before the de-
fendant's statement was made and the seriousness of the
charges against the defendant), and responds that the judge
correctly concluded that Berry was incapable of providing
the defendant with an opportunity for a meaningful
consultation.

In general, "the prosecution has a heavy burden to demon-
strate that the defendant knowingly and intelligently waived
his privilege against self-incrimination and his right to re-
tained or appointed counsel." *Commonwealth* v. *Guyton*, 405
Mass. 497, 500 (1989). In addition, where the defendant is a
juvenile, courts must proceed with "special caution" when re-
viewing purported waivers of constitutional rights. See, e.g.,
*Commonwealth* v. *A Juvenile*, 389 Mass. at 132-133; *Com-
monwealth* v. *Cain*, 361 Mass. 224, 228 (1972). As to
juveniles at least fourteen years old at the time of the pur-

ported waiver, the prosecution must show that, before the disputed statement was obtained, the juvenile was advised of constitutional rights through a reading of the Miranda warnings and was afforded the opportunity to consult with an interested adult who was informed of, and understood, those rights. See *Commonwealth* v. *Guyton, supra* at 500-502, citing *Commonwealth* v. *A Juvenile*, 389 Mass. at 131-134.[2]

It is not necessary for such a juvenile actually to consult with the interested adult, for it is the *opportunity* to consult that is critical. *Commonwealth* v. *MacNeill*, 399 Mass. 71, 78 (1987). So long as the juvenile is at least fourteen and has the opportunity for a meaningful consultation, the juvenile may make a valid waiver without actual consultation. See *id.*[3] "[T]he ultimate question is whether the juvenile has understood his rights and the potential consequences of waiving them before talking to the police." *Id.* at 79.

In this case, before the defendant (who was over sixteen) made his statement, he was advised of his Miranda rights in his father's presence. Both the defendant and his father expressly stated that they understood the warnings; both read and signed the Miranda card; both knew the charges against the defendant; and both were sober, not under the influence of drugs, and to all appearances not otherwise incapacitated or incompetent. Throughout this period, the treatment of the defendant by the police was proper, and the police in general conducted themselves with "meticulous concern" for the defendant's rights. In this context, the defendant gave the statement that he now desires to suppress.

It is clear that Berry was upset when the defendant spoke to the police, as any concerned parent would be upon learn-

---

[2] Juveniles under age fourteen must actually consult with an interested adult before a valid waiver of rights can occur. See *Commonwealth* v. *A Juvenile*, 389 Mass. at 134.

[3] "In the absence of . . . an opportunity [for a meaningful consultation], any statement should be suppressed unless the circumstances demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." *Commonwealth* v. *A Juvenile*, 402 Mass. 275, 279 (1988).

ing that a child had been charged with murder. It does not follow, however, that, because Berry was "in a daze" and "out of it," the defendant was deprived of the opportunity for a meaningful consultation. Before Berry was advised of the charges against his son, roughly twelve hours had elapsed since the turbulent events of the previous night. During that period, Berry was visited, assisted, and somewhat calmed by his Alcoholics Anonymous sponsor. When Berry learned that his son was charged with murder, he went to the police station, spoke with his son for fifteen to twenty minutes, and told him that he loved him. Berry thus demonstrated concern for his son and an ability to forget his anger of the previous night. When the police summoned Berry the second time, he arrived in minutes, again seeming to display a genuine concern and a willingness to participate in the proceedings involving his son.

During the course of these events, there were no objective indications of continuing animosity between Berry and his son, and no evidence apparent to the police that, when the Miranda card was signed, Berry was manifestly unable or unwilling to consult with his son regarding the significance of making a statement. On these facts, we can only conclude that the defendant had an opportunity for a meaningful consultation with his father, that he understood his rights and the potential consequences of waiving them before he gave his statement, and that he considered a further consultation with his father unnecessary. See *Commonwealth* v. *Tevenal*, 401 Mass. 225, 227-228 (1987); *Commonwealth* v. *MacNeill, supra* at 79.

Notwithstanding this conclusion, we do not reject the general proposition that — in circumstances not present here — an adult may be present during a juvenile's purported waiver of constitutional rights and yet for some reason be disabled such that the juvenile for practical purposes has no opportunity for a meaningful consultation. Although many scenarios in which this problem could arise are foreseeable, obvious examples include adults who lack the mental capacity to appreciate the juvenile's situation and the significance of a waiver

of rights, see *Commonwealth* v. *MacNeill*, *supra* at 78 (adult claimed to have been drunk at critical point), or adults who are officially required to report the juvenile's offensive conduct to the authorities. See *Commonwealth* v. *A Juvenile*, 402 Mass. 275, 278-280 (1988) (adults were obligated to report defendant's conduct to police). Therefore (as was the motion judge here), judges should be alert to this problem. In cases, assessed by objective standards, where the police should reasonably have known that the supposed interested adult was unable to provide the juvenile with the opportunity for a meaningful consultation, the judge should make appropriate findings and then evaluate the motion as if no adult were present and as if the juvenile had no opportunity for a consultation. Because this is not such a case, the defendant's statement should not have been suppressed.

The order allowing the defendant's motion to suppress is reversed, and the case is remanded for trial.

*So ordered.*