COMMONWEALTH *vs.* PHILIP S., a juvenile.

No. 91-P-1329.

Essex. April 7, 1992. - June 24, 1992.

Present: BROWN, JACOBS, & GILLERMAN, JJ.

Further appellate review granted, 413 Mass. 1106 (1992).

*Constitutional Law*, Waiver of constitutional rights, Admissions and con-
    fessions, Parent and child. *Waiver.*

In a proceeding on a motion to suppress a juvenile's statements given at a
    fire station during investigative interviews by members of a city fire
    department and the State police, the record amply supported the
    judge's implicit finding that the juvenile, then age twelve years and
    eleven months, was in custody during each interrogation, and warranted
    a conclusion that a reasonable person in the juvenile's position would
    have believed that he was not free to leave. [725-726]
A juvenile's custodial statements to members of a city fire department and
    the State police were properly suppressed from evidence where the rec-
    ord did not show that the juvenile, then age twelve years and eleven
    months, had signed a form signifying waiver of his rights protected by
    the Miranda warnings, or had otherwise waived his rights. [726-727]
A juvenile's custodial statements to members of a city fire department and
    the State police were properly suppressed from evidence where, al-
    though the juvenile, prior to interrogation, had signed a form signifying
    waiver of his rights protected by the Miranda warnings, the opportunity
    afforded him for consultation with his mother did not carry the Com-
    monwealth's burden of demonstrating that the juvenile, then age twelve
    years and eleven months, had had an actual and meaningful consulta-
    tion with an interested adult and that he understood the rights he was
    relinquishing. [727-730]

COMPLAINT received and sworn to in the Lawrence Divi-
sion of the District Court Department on December 21,
1989.

A pretrial motion to suppress evidence was heard by *Isaac
Borenstein*, J.

*S. Jane Haggerty*, Assistant District Attorney, for the
Commonwealth.

*Robert F. Kelley* for the defendant.

GILLERMAN, J. During the course of investigative interviews by members of the Lawrence fire department and the Massachusetts State police, a juvenile, whom we shall call Philip, signed two statements in the presence of his mother in which he admitted that he set fire to a couch on the porch of their second-story apartment. The fire subsequently engulfed the three-story wooden dwelling. A Lawrence firefighter was seriously injured while fighting the fire. He died several days later as a result of the injuries, and Philip was charged with delinquency by reason of manslaughter. When he gave the statements, Philip was twelve years and eleven months old. Prior to this episode, he had no juvenile record.

Philip's counsel filed a motion to suppress the two statements, and after hearings on May 22, 1990, and June 6, 1990, a judge of the Lawrence District Court in juvenile session allowed the motion on July 17, 1990. The judge's findings and order were not issued until November 4, 1991; he concluded that Philip did not knowingly, intelligently, or voluntarily waive his right against self-incrimination under the Fifth Amendment to the Federal Constitution, see *Commonwealth* v. *MacNeill*, 399 Mass. 71, 74-79 (1987), which is fully applicable to cases involving juveniles. See *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 130 (1983). The Commonwealth has appealed; we affirm.

We summarize the facts that bear on the Commonwealth's arguments that Philip was not held in custody when he admitted to setting the fire, and that in any event Philip knowingly, intelligently, and voluntarily waived his rights. The subsidiary facts, which are contained in the judge's findings and in the record of the proceedings before him, are largely undisputed. Absent clear error, we accept the judge's subsidiary findings, and we give substantial deference to his ultimate findings; we make our own determination of the correctness of the application of the law to his findings. *Commonwealth* v. *MacNeill, supra* at 76. *Commonwealth* v. *Dunn*, 407 Mass. 798, 804-805 (1990). *Commonwealth* v. *Azar, ante* 290, 296 (1992).

1. *The custody issue.* The judge's memorandum of decision does not include any findings concerning Philip's claim that he was held in custody during the period of the interrogation. Nevertheless the judge's suppression of the two statements may be construed as an implied finding in favor of Philip on that issue. See *Commonwealth* v. *Lanoue*, 392 Mass. 583, 586 n.2 (1984) (judge's failure to make detailed subsidiary findings does not require a remand "where the ultimate conclusion is clearly evident from the record"), S.C., 400 Mass. 1007 (1987) and 409 Mass. 1 (1990); *Commonwealth* v. *A Juvenile*, 402 Mass. 275, 280 (1988). In general, custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Commonwealth* v. *Bryant*, 390 Mass. 729, 736 (1984), quoting from *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). There was ample evidence in the record to support the conclusion that Philip was in custody prior to the interrogation. The test is "how a reasonable person in the juvenile's position would have understood his situation." *Commonwealth* v. *A Juvenile*, 402 Mass. at 277. The standards which we apply are set out in *Commonwealth* v. *Bryant*, *supra* at 737;[1] "[r]arely is any single factor conclusive." *Ibid.*

Philip was interviewed on December 18, 1989, and again on December 20, 1989. The circumstances were as follows.

(a) *The December 18, 1989, interview.*[2] Captain Kevin Ord of the Lawrence fire department, an expert in determining the origin of fires, arrived at the fire scene at approximately 8 A.M. on December 18, 1989. The fire had by then been extinguished. After examining the building he determined that the fire had originated on the second floor porch where the couch was located. Captain Ord learned that the

---

[1]The relevant factors are (1) the place of the interrogation, (2) whether the investigation has begun to focus on the suspect, (3) whether the interrogation was aggressive or informal, and (4) whether the suspect was free to end the interview. *Commonwealth* v. *Bryant*, *supra* at 737.

[2]The witnesses who testified to the events of December 18, 1989, were Captain Ord of the Lawrence fire department and Trooper Neal Dwyer of the Massachusetts State police.

occupants of the second floor were Philip, his mother (whom we shall call Mrs. Smith) and her husband; that Mrs. Smith was a taxicab dispatcher and Mr. Smith drove a taxicab; and that when the fire started Philip was home alone. On the basis of this information Ord believed that Philip might be involved in the starting of the fire.

Captain Ord contacted Mrs. Smith, told her he was interviewing all the occupants of the house, and asked her to bring her son to the fire station. Mrs. Smith agreed to appear, and she and Philip arrived at the fire station where they were met by Captain Ord, Trooper Neal Dwyer of the Massachusetts State police, and Lieutenant John Burton of the Lawrence fire department. Dwyer was in plain clothes; the others were in uniform.

Philip was asked to give an account of what happened the evening the fire started. After Philip gave his description of events, Captain Ord called a break, and left the room with Dwyer. He told Dwyer that Philip's story did not make sense. Dwyer agreed. Ord and Dwyer then returned to the interview room, and Dwyer read the Miranda warnings to Philip and his mother from a card he carried. After each of the warnings, he asked them if they understood; separately, they said that they did. Mrs. Smith signed the waiver provision on the Miranda card, but Philip did not. There is nothing in the record describing the circumstances of Philip's failure to sign the waiver.

At this point, Dwyer told Mrs. Smith that the officers were going to leave the room, and in their absence Philip should tell his mother the truth about the fire "and tell us the truth afterwards." The officers left the room, returned in less than ten minutes, and resumed their questioning of Philip. This time Philip identified certain television shows he said he had been watching. Ord fetched a television guide and showed Philip that the shows he had identified were not on television that night. According to Ord, Philip then became hysterical, screamed at Ord, jumped up and ran out of the building.

Philip was not gone for long. Mrs. Smith went after him and brought him back to the officers. The questioning re-

sumed without Ord, who by then had concluded that his presence was upsetting Philip. According to Dwyer, Philip was now the focus of the investigation. There was no repetition of the reading of the Miranda rights. Instead, Dwyer instructed Philip to "tell the truth," and Philip continued with his account of events which, according to Dwyer, changed every five minutes. Mrs. Smith repeatedly told Philip to "tell them the truth." By then, Dwyer was convinced that Philip had set the fire. Between one and two hours later, Dwyer had obtained an inculpatory statement from Philip. The statements, which were written out by Dwyer, were then signed by Philip and Mrs. Smith, and they left the fire station.

(b). *The December 20, 1989, interview.* The police, with the consent of Mrs. Smith, arranged a second interrogation of Philip on December 20. Philip was offered a ride to the Lawrence fire station by the police, and he accepted. The second interrogation was conducted by Trooper Paul Zipper and Corporal John Garvin of the Massachusetts State police; both men were dressed in plain clothes with concealed weapons. Zipper and Garvin both knew, before the interview started, that the injured firefighter had died. They also understood from the beginning of the questioning that Philip was the focus of the investigation.

Corporal Garvin read the Miranda warnings to Philip and his mother. He then asked Philip and his mother whether they understood the rights just described. Each one replied "yes." Garvin then asked, "Having those rights in mind, do you wish to talk to us now?" Philip said "Yes," and his mother said, "I want him to tell you the truth." Zipper and Garvin then left the room after telling Philip and his mother that they would have the opportunity to discuss between them the rights that had just been read to them. The officers returned after ten or fifteen minutes. Philip and his mother were sitting silently in the room, and nothing is known of what, if anything, was said between them. Indeed, the judge found that Mrs. Smith "did not view her role as one of 'counseling' Philip vis-a-vis the exercise of his privilege. . . .

Mrs. [Smith] had the specific goal of eliciting statements from Philip for the benefit of her son's questioners. 'Tell the truth' was Mrs. [Smith's] only advice to her son throughout the two days of questioning." Without regard to whether that advice was good or bad, or right or wrong, it most assuredly was incomplete.

Mrs. Smith then gave her permission to the continuation of the interview, and she continued to insist that Philip tell the truth of what happened. Philip said he would tell what happened. At 3:35 P.M. Philip and his mother then signed the waiver provision on the Miranda card from which Garvin had read their rights. The judge found that following the reading of the Miranda warnings, Philip was never reminded that he remained free to leave.

The interrogation of Philip continued for more than four hours,[3] with a few breaks of varying duration. By 7:30 P.M. the officers concluded that there was nothing more to be learned, and the interrogation terminated. The statements, as written out by the police, were read back to Philip and his mother; they initialed each page and signed the last page. The discussion turned to where Philip was going to spend the night. His mother said she did not want Philip to come home with her. The officers contacted a caseworker who had worked with Philip before, and Philip left the station with her. Summarizing the interrogation, the judge found that "[i]n two days, [Philip] was interrogated by four officials, men who were aggrieved by the death of a colleague whose life was lost in the fire [Philip] . . . was suspected of setting. The commanding presences of these witnesses coupled with their large physiques — each was close to or over six feet tall — were easily overbearing on a twelve year old child."

The evidence which we have summarized is sufficient to support the implied finding that Philip was in custody when questioned on December 18 and 20. The place of interrogation was the fire station. When the questioning began on the eighteenth, Captain Ord had already concluded that the fire

---

[3]The judge found that at one point Mrs. Smith struck Philip because he was picking at the frayed edges of the couch upon which he was sitting.

had originated in the second-floor apartment where Philip
was alone that night. Ord thought that Philip was implicated
in the setting of the fire. One of Ord's fire fighters had been
seriously injured in the fire, and Ord, understandably,
wanted to get to the truth of what happened. When Philip's
first version of events was not believed, Ord's suspicion of
Philip increased substantially, and the Miranda warnings
were read — not out of "abundant caution"[4] — but because
Ord was suspicious of Philip and he saw the need of intense
interrogation. His questioning of Philip, by his own admis-
sion, was so aggressive that Philip became hysterical, fled
from the station, and Ord was obliged to withdraw his par-
ticipation in the interview. Philip's freedom from the interro-
gation was short-lived. He was returned by his mother, and
by the end of the session Philip had admitted to setting the
fire. The four-hour interview on the twentieth, if anything,
was more intense. The record shows that even the officers
were worn down by 7:30 P.M. Philip, under persistent pres-
sure from the officers and his mother, had confessed in detail
about setting the fire. A reasonable person in the position of
Philip, a boy not yet thirteen, would have believed that he
had no choice but to do what his mother and the officers told
him to do: remain at the station and answer the questions
until the end of the interrogation. These circumstances are
more than enough to satisfy the standards of *Commonwealth
v. Bryant*, 390 Mass. at 737. See note 1, *supra*.

2. *The waiver.* Since Philip was entitled to the benefit of
the Miranda warnings, we must inquire whether, prior to the
interrogation, he waived his Fifth Amendment rights, and if
he did, whether the waiver was knowing and intelligent. As
to the December 18 interrogation, the Commonwealth does
not dispute the fact that Philip never signed the waiver provi-
sion on the Miranda card, and there is no suggestion in the
record or in the Commonwealth's brief that Philip, by any
other act, waived his rights. Mrs. Smith signed the waiver
provision, but that does not operate as a waiver by Philip, for

---

[4]See *Commonwealth* v. *Azar*, *supra* at 297, quoting from *Common-
wealth* v. *Bryant*, 390 Mass. at 737-738 n.8.

the rights belong to Philip. See *Commonwealth* v. *A Juvenile*, 389 Mass. at 132; *Commonwealth* v. *MacNeill*, 399 Mass. at 79. Because Philip did not even purport to waive his Fifth Amendment rights, the December 18 statement was not properly obtained by the Commonwealth, and it must be suppressed. See *Haley* v. *Ohio*, 332 U.S. 596, 601 (1948) (no waiver by a fifteen year old who signed a confession that began with the statement that he had been advised of his right to remain silent and that anything he said could be used against him). Contrast the rule for adults; see *Commonwealth* v. *Corriveau*, 396 Mass. 319, 330 (1985) (an express waiver not required where defendant, an experienced and well-educated businessman, was informed of his rights and understood them); *Commonwealth* v. *Dunn*, 407 Mass. at 805.

Philip did sign a waiver prior to questioning on December 20. Nevertheless the judge suppressed the statement on the grounds that the Commonwealth failed to show that Mrs. Smith satisfied the interested adult rule, and that it failed to show that an actual consultation took place between Philip and his mother prior to the interrogation.[5]

It is well established that, in order to demonstrate a knowing and intelligent waiver by a juvenile, the Commonwealth must show, in most cases, "that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of the waiver of these rights." *Commonwealth* v. *A Juvenile*, 389 Mass. at 134. For juveniles under the age of fourteen, there must be an actual consultation with an interested adult, not merely the opportunity to consult. *Commonwealth* v. *Berry*, 410 Mass. 31, 35 n.2 (1991). Moreover, that consultation must be a meaningful one, conveying the information the juvenile needs to know and understand in order that any possible waiver be knowing and intelligent. Compare *Commonwealth* v. *A Juvenile*, 402 Mass. at 279 (in order to ensure a knowing and intelligent

---

[5]The judge did not distinguish between the interrogation on December 18, 1989, and that on December 20, 1989.

waiver by minors over fourteen years, there must be an opportunity for a *meaningful* consultation). In all cases, the Commonwealth has a "heavy burden"[6] to demonstrate a waiver of the privilege against self-incrimination, and the courts must exercise "special caution" when reviewing the claim that a juvenile has waived his constitutional rights. *Commonwealth* v. *Berry*, 410 Mass. at 34. *Commonwealth* v. *Guyton*, 405 Mass. 497, 500 (1989).

The special protection of the constitutional interests of minors is derived from empirical studies which concluded that "most juveniles do not understand the significance and protective function of these [constitutional] rights even when they are read the standard Miranda warnings." *Commonwealth* v. *A Juvenile*, 389 Mass. at 131. See *Gallegos* v. *Colorado*, 370 U.S. 49, 54 (1962) ("But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police"). Massachusetts, too, recognizes the special vulnerability of children under the age of fourteen. See *Commonwealth* v. *A Juvenile*, 389 Mass. at 134. Thus the critical point of inquiry, in cases involving juveniles under the age of fourteen, is whether the Commonwealth has demonstrated that the juvenile did in fact comprehend the nature and extent of his rights, and the full measure of the consequences of waiving those rights. *Commonwealth* v. *MacNeill*, 399 Mass. at 79 ("the ultimate question is whether the juvenile has understood his rights and the potential consequences of waiving them before talking to the police"). See *State* v. *Nicholas S.*, 444 A.2d 373, 380 (Me. 1982) (the limited explanation of rights to a fourteen year old juvenile insufficient to find that the juvenile was aware of his rights and the consequences of forgoing them). While outward manifestation of comprehension will do for a sober adult, see *Commonwealth* v. *Dunn*, 407 Mass. at 805 (defendant said he understood his rights after the Miranda warnings read to him), more is required of

---

[6]In Massachusetts, the Commonwealth must prove a knowing and intelligent waiver beyond a reasonable doubt. *Commonwealth* v. *Day*, 387 Mass. 915, 921 (1983).

the Commonwealth where a juvenile under the age of fourteen is involved. Contrast *Commonwealth* v. *Ward*, 412 Mass. 395, 397 (1992) (juvenile of sixteen years signed Miranda card and his mother said she thought her son understood his rights). The danger is that the Miranda warnings become "merely a ritualistic recitation," while the critical inquiry — whether the juvenile understood the warnings and the consequences of a waiver — is left untouched. See *Commonwealth* v. *A Juvenile*, 389 Mass. at 132.

Thus we reject the Commonwealth's argument that the fire officials and police "reasonably relied on the acknowledgment of the mother and son that they understood and waived Miranda rights and that the mother was capable of providing necessary guidance to her son." Whatever may be said about the capability of Mrs. Smith to advise her son, there is nothing in the record which even suggests that she explained anything to Philip about his rights or the consequences of a waiver. The judge found that, for the reasons discussed above, Mrs. Smith did not qualify as an "interested adult." But whether she was or not, it is clear to us that, in a case involving a juvenile under fourteen years of age with no prior record, the Commonwealth's reliance on the mother-son relationship, even when coupled with the fact that mother and son were left alone for ten to fifteen minutes with instructions to discuss the warnings just read to them,[7] is not enough for a court to conclude that the Commonwealth carried its "heavy burden" of demonstrating that the consultation conveyed the vital information that Philip needed to know. See *Commonwealth* v. *A Juvenile*, 389 Mass. at 132. Because the police failed to determine that Philip understood his rights, there is nothing in this record from which a judge could conclude that this boy of less than thirteen years, with no prior record, had in fact understood the warnings that were read to him, or the meaning and consequences of a waiver.

---

[7]There is no fixed rule that the required consultation must be in private. See *Commonwealth* v. *Ward*, 412 Mass. at 397.

We conclude, therefore, that in the circumstances presented here, Philip did not voluntarily, knowingly, or intelligently waive his Fifth Amendment rights, and the judge was correct in suppressing the statements of December 18, 1989, and December 20, 1989.[8]

*Order allowing motion to suppress affirmed.*

---

[8]Massachusetts cases holding that a juvenile has made a knowing and intelligent waiver of his Miranda rights appear to have all involved juveniles over the age of sixteen. See *Commonwealth* v. *Tavares,* 385 Mass. 140, cert. denied, 457 U.S. 1137 (1982) (seventeen years old); *Commonwealth* v. *MacNeill,* 399 Mass. 71 (1987) (sixteen years, eight months old); *Commonwealth* v. *Tevenal,* 401 Mass. 225 (1987) (three weeks short of seventeenth birthday); *Commonwealth* v. *Berry,* 410 Mass. 31 (1991) (sixteen years, four months); *Commonwealth* v. *Ward,* 412 Mass. 395 (1992) (sixteen years of age); *Commonwealth* v. *King,* 17 Mass. App. Ct. 602 (1984) (sixteen years old). Contrast cases holding no waiver: *Commonwealth* v. *Cain,* 361 Mass. 224 (1972) (fifteen years of age); *Commonwealth* v. *A Juvenile,* 389 Mass. 128 (1983) (thirteen years of age); *Commonwealth* v. *A Juvenile,* 402 Mass. 275 (1988) (over the age of fourteen); and *Commonwealth* v. *Guyton,* 405 Mass. 497 (1989) (sixteen years of age).