BENTON, Judge,
dissenting.
On Monday, March 4, two boys, age nine and age seven, were reported missing in the City of Virginia Beach. Novak, a high school student who six weeks earlier had turned sixteen, participated in the search for the two boys. The police inquiry into the murder of the boys led them to question a number of people, including Novak. Novak had spoken to someone on the police “hot line” the day after the bodies of the murdered boys were discovered and said that he had seen them walk into the wooded area where their bodies were found.
On March 6, Novak’s mother received a telephone call at work from Detective Hoover. He asked for permission to talk to her children. Novak’s mother initially replied, “no,” but consented after the detective pressed her for consent. After agreeing to the detective’s request, she called home and learned that the detective was already in her home when he called. When she learned that the detective was questioning Novak in the detective’s vehicle, she made arrangements to leave work.
That same afternoon, Giselle Ruff, a police evidence technician, took photographs of Novak’s bedroom. Later that evening Detective Hoover returned and requested permission to talk to Novak in his car. Novak’s mother refused. At the detective’s request, she agreed to take Novak to the police station. She stated, however, that when they arrived at the police station she was not invited into the room where Novak was interviewed for two hours.
Novak was upset when the police ended the questioning. The police told Novak’s mother on Wednesday night that they wanted to talk to him again. She told them that she did not want them to talk to Novak unless she was present.
*395 Novak was again questioned at his home on Thursday afternoon, March 7, by Detective Tucker and perhaps others. When Detective Tucker called Novak’s mother at work and asked for permission to 'talk to Novak, she became upset because they were again in her house talking to Novak. She told Tucker he could not talk to Novak.
Later that day, the detective called Novak’s mother again and asked her to bring Novak back to the police station. On Thursday evening she brought Novak to the police station. Detective Hoffman questioned him for two hours. Again, Novak’s mother was not invited in the interview room. During questioning, the detective discovered inconsistencies between Novak’s statements and information obtained from other witnesses. Novak’s mother was asked to bring Novak to the police department the next day for further questioning.
Novak’s mother testified that she was particularly concerned and very protective of Novak in connection with police questioning. Novak had no previous contact with police or court history. She was also concerned because Novak’s father, who was away on duty in the United States Navy, could not be reached. She had complained to the police about their previous interviews with Novak out of her presence and felt that she was being manipulated by the police department.
Novak and his mother arrived at the police station at 9:00 a.m. Saturday, March 9. When Detective Hoffman began the interview, he advised Novak and his mother that Novak was not a suspect and was not under arrest. The detective told her that he only wanted to clarify some things and determine whether Novak had seen something and not realized its significance. Novak’s mother decided to remain in the interrogation room. Unknown to Novak and his mother, the entire session was videotaped.
Novak was not advised of his right to an attorney or to remain silent. After about thirty minutes of questioning, Detective Hoffman asked Novak’s mother to leave the interrogation room. She reluctantly did so after Detective Hoffman assured her that Novak was not a suspect and that he wanted *396 to talk with Novak about “sensitive areas not dealing with these kids.” She left the interrogation room and remained in the lobby of the police headquarters.
After Novak’s mother left, Detective Hoffman changed his position in the interrogation room so that he was seated facing Novak. Detective Hoffman recommenced the interview as other detectives viewed the interrogation through a one-way mirror and videotaped the questioning. The interrogation was stopped on several occasions, when Novak went to the bathroom, had a soft drink, ate a donut, and spoke once with his mother.
Detective Hoffman told Novak that he could rely on him and that he was not suspected of anything. However, Detective Hoffman began to he to Novak as the interview progressed. He lied about police observations on the day of the search; he lied about the presence of a witness who saw Novak walking with the two victims; he lied about new laser technology which enabled them to secure fingerprints; and he lied about Novak’s fingerprints being found on the boys’ clothing.
Detective Hoffman testified that he would not have told Novak any lies if Novak had not been a suspect. He testified that Novak became a suspect and the primary focus of the investigation during the course of the interrogation. He further testified, however, that he was “suspicious” of Novak when he began the interview.
Shortly before noon, Detective Hoffman assured Novak that he was not a suspect. He continued to interrogate Novak in a barely audible tone using lies and information gathered from other witnesses. Hoffman then confronted Novak with contradictions in his statements and the evidence gathered from other witnesses. The detective got Novak to admit being with the boys and then asked the following:
Q Shawn, I know you cut the branches. I know that you cut them and covered them. Isn’t that true?
A Yeah. They had been on the ground. Were on the ground. I walk by. Monday.
*397 Q Shawn. You can talk to me. Don’t be afraid. Get it out. Don’t be afraid. Something happened and you went too far? Is this something that just happened?
A Yeah.
Q You killed them, didn’t you?
A (No audible response. Shawn nods his head in the affirmative.)
Q You killed Scott and Daniel?
A Yes.
Q Okay. Shawn, do you want to talk about it? Huh? [There was a knock at the door.]
DET. HOFFMAN: I’ll be back in a minute.
[Whereupon a recess was taken. Shawn is left in the room alone and is crying. After the recess Det. Hoffman returns to the room and the interview continues as follows:]
BY DET. HOFFMAN:
Q Shawn, are you okay?
A Yeah.
Q I need to read something to you.
You have the right to remain silent. Anything you say can and will be used against you in court. You have a right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.
Do you understand these things that I just told you?
A (Shawn nods head.)
Q Check here.
A (Shawn complies.)
Q Having these rights in mind, would you like to talk to me?
A (The witness nods head.)
Q Check here.
A (Shawn complies.)
*398 Q Sign your name for me right here.
A (Shawn complies.)
Q Do you want me to tell her or do you want me to wait?
A Let her know.
The detective continued to question Novak without interruption. Two hours after she was asked to leave the room, Novak’s mother was informed by an officer of Novak’s admissions. She demanded that the interrogation be stopped and that she be allowed to consult with a lawyer.
I.
Statements made by an accused during custodial interrogation and without proper Miranda warnings are inadmissible as evidence. Dean v. Commonwealth, 209 Va. 666, 667-68, 166 S.E.2d 228, 230 (1969). The Supreme Court has defined custodial interrogation as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (footnote omitted). In making the determination whether a person has been deprived of freedom of action, the situation must be viewed from the perspective of “how a reasonable [person] in the suspect’s position would have understood his situation.” Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (footnote omitted). Merely “informing a suspect that he is not in custody and is free to leave does not necessarily mean that he is not in custody.” Wass v. Commonwealth, 5 Va.App. 27, 34, 359 S.E.2d 836, 840 (1987). The circumstances that must be considered in determining whether an interrogation is custodial include “whether a suspect is questioned in familiar or neutral surroundings, the number of police officers present, the degree of physical restraint, ... the duration and character of the interrogation, [w]hether or when probable cause to arrest exists[,] ... when the suspect becomes the focus of the investigation[,] ‘[t]he language used by the officer to summon the individual, the extent to which he *399 or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual.’ ” Id. at 32-33, 359 S.E.2d at 839 (citations omitted).
The evidence proved that when Novak was interrogated on Saturday morning the circumstances effectively rendered the interrogation custodial. By virtue of his youthful age and lack of experience with the police, Novak had no basis upon which to conclude that he had not been deprived of his freedom of action. Novak was interrogated at the police station. The interrogation occurred in a small, closed room. He had been interrogated at the same place on two prior occasions. At each of those interrogations, the police separated him from his mother. On this third occasion his mother requested that she be permitted to remain in the room during the questioning. Half an hour later, however, with Novak present in the room, Detective Hoffman asked Novak’s mother to leave. Hoffman admitted deceiving Novak’s mother in order to get Novak alone in the interrogation room. When Novak’s mother left, Detective Hoffman moved his chair closer to Novak, placing himself between Novak and the door in the small room. He also lied to Novak at least four times during the course of the interrogation.
Although Detective Hoffman testified that Novak did not become a suspect until contradictory facts were elicited during the course of the Saturday interrogation, the objective facts belie that assertion. Hoffman also testified that he was “suspicious” of Novak prior to the Saturday interrogation. Moreover, several photographs of Novak’s bedroom were taken four days prior to this interrogation. In addition, the detailed questioning of Novak’s conduct, movements, and statements during interrogations which lasted several hours each over the course of four days manifestly establish that Novak was a suspect in the police’s investigation prior to this last interrogation. This last session was just the culmination of an investigation that focused upon Novak as a suspect.
*400 The interrogation was accusatory, it was suggestive, repetitive, and deceptive. It was the last in a series of five interrogations that took place over a four day period. All of these circumstances surrounding this investigation as well as the events of the interrogation itself prove that the interrogation was custodial. Any reasonable person in Novak’s position would have so understood. The detective used the opportunity to exclude Novak’s mother and to bear down upon the sixteen year old in the confines of an interrogation room at the police station. Novak was questioned in the coercive setting of the police station in the absence of any Miranda warnings.
In determining that Novak was not in custody when .he confessed, the majority posits that Novak voluntarily came to the police station with his mother that morning. Even if this interrogation was not custodial at its inception, the evidence proved that the atmosphere of the interrogation changed when Novak’s mother was deceived into leaving the room. Detective Hoffman positioned himself closer to Novak, used ruses to trick him, and extracted his confession by accusing Novak of killing the boys. Under these circumstances, a reasonable sixteen year old would have believed that he was required to answer the police officer’s questions and was not free to leave until he did so.
II.
“The burden is upon the Commonwealth to prove, by a preponderance of the evidence, that [Novak’s] statement was voluntary.” Williams v. Commonwealth, 234 Va. 168, 172, 360 S.E.2d 361, 364 (1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). “The test to be applied in determining voluntariness is whether the statement is the ‘product of an essentially free and unconstrained choice by its maker,’ or ... whether the maker’s will ‘has been overborne and his capacity for self-determination critically impaired.’ ” Stockton v. Commonwealth, 227 Va. 124, 140, 314 S.E.2d 371, 381, cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984) (quoting Schneckloth v. Bustamante, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973)). Thus, an inquiry *401 must be made into the circumstances of the interrogation, including “evaluation of the juvenile’s age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequence of waiving those rights.” Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).
An analysis of these factors coupled with the tactics used to extract the confession from Novak mandates the conclusion that Novak’s confession was involuntary and not a product of his own free will. The absence of a parent is “a circumstance that weights] against the admissibility of the confession.” Miller v. Maryland, 577 F.2d 1158, 1159 (4th Cir.1978). That circumstance must be given significant weight in view of Detective Hoffman’s deliberate decision to deprive Novak of the opportunity to have a parent present who could provide assistance in asserting his constitutional rights.
The detective knew that Novak’s mother had affirmatively stated that she wanted to be present. Novak’s mother testified that on two occasions prior to the day of Novak’s confession, police officers had called her at work asking if they could question Novak. She was adamant that any questioning be done in her presence. When she accompanied Novak to the police station on Saturday morning, she asked to be in the interrogation room. After being told that Novak was not a suspect and that Detective Hoffman understood her concerns, she was asked to leave the room. Detective Hoffman admitted misleading Novak’s mother so that she would leave Novak alone in the interrogation room. The detective’s trickery is a compounding factor to be considered in the totality of the circumstances analysis. See Spano v. New York, 360 U.S. 315, 327, 79 S.Ct. 1202, 1209, 3 L.Ed.2d 1265 (1959).
The detective lied to Novak’s mother when he stated that he needed to talk to Novak about a sensitive matter unrelated to the dead children. As soon as she left the room, the detective began to question Novak about his involvement in the murders. The detective’s deceptive conduct heightened the coer *402 cive atmosphere in which Novak made the confession and evidences the conclusion that the officer was attempting to overcome Novak’s free will. See Commonwealth v. MacNeill, 399 Mass. 71, 502 N.E.2d 938, 942 (1987) (“[Deliberate police avoidance of a parent’s participation in an exchange between the police and a juvenile ... would be highly suspect.”).
The opportunity for a juvenile to have a parent present to afford protection for the free exercise of the juvenile’s constitutional rights cannot be overemphasized. The Supreme Court has noted that “admissions and confessions of juveniles require special caution.” In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 1453, 18 L.Ed.2d 527 (1967). Indeed, the Court has recognized that with juveniles “we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.” Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325 (1962). Several states believe that the presence of a parent or other adult representative is so important that they have a per se rule that requires that a juvenile be given Miranda warnings and the opportunity to consult with an adult who understands these rights before an admission may be obtained from a juvenile. See Commonwealth v. A Juvenile (No. 1), 389 Mass. 128, 449 N.E.2d 654 (1983).
In addition to misleading Novak’s mother, Detective Hoffman admitted lying to Novak during the interrogation. His lies and trickery are factors that weigh heavily against a finding of voluntariness. Spano, 360 U.S. at 327, 79 S.Ct. at 1209; Rodgers v. Commonwealth, 227 Va. 605, 614, 318 S.E.2d 298, 303 (1984). The detective’s lies, coupled with leading and “suggestive questioning,” Morris v. Commonwealth, 17 Va. App. 575, 580, 439 S.E.2d 867, 871 (1994), constitute conduct designed to provoke Novak’s confession.
Detective Hoffman’s tactics cannot be viewed only in light of the nature of the questioning. His exploitative tactics were practiced on a barely sixteen year old youth who had never
*403 before been involved in any criminal activity. A juvenile’s lack of “[p]revious exposure to the criminal justice system” also is a factor that weighs against a finding of voluntariness. Green v. Commonwealth, 223 Va. 706, 710, 292 S.E.2d 605, 608 (1982).
The record clearly established that during the interrogation Novak’s responses accorded with Officer Hoffman’s suggestive questioning. Novak, who, according to the prosecutor’s psychiatrist, exhibited signs of “immaturity” and “a need for being recognized and appreciated” was no match for Hoffman’s skill in extracting confessions. Under the best of circumstances, a sixteen year old “boy, no matter how sophisticated is unlikely to have any conception of what will confront him when he is made accessible only to the police.” Gallegos, 370 U.S. at 54, 82 S.Ct. at 1212.
Another factor to be considered is the failure to give any Miranda warnings until after Novak made his admissions. “Proof that some kind of warnings were given or that none were given [is] relevant evidence ... of whether the questioning was in fact coercive.” Beckwith v. U.S., 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976). The detective testified that he considered Novak “suspicious” before the interrogation, and that, as the interrogation proceeded, Novak became a suspect. It was not until Novak confessed and Hoffman was interrupted by another officer who had been observing the questioning, however, that Miranda warnings were read to Novak. Furthermore, the videotape of the session established that the warning was given in barely audible tones while Novak was clearly upset. The officer then addressed Novak’s level of understanding only in a perfunctory fashion and obtained his written waiver, by causing him to make a check mark without explanation. The interrogation then proceeded without interruption.
Because all of these factors unequivocally establish that Novak was deprived of his freedom of action and that Novak’s confession was involuntary, I would hold that the Commonwealth failed to prove that the confession was voluntary and *404 admissible. Accordingly, I would reverse his conviction. I dissent.